## FASHION ORIGINATORS' GUILD OF AMERICA, INC., ET AL. *v.* FEDERAL TRADE COMMISSION.

No. 537.   Argued February 10, 1941.—Decided March 3, 1941.

458

*Mr. Charles B. Rugg,* with whom *Messrs. Milton C. Weisman, Archibald Cox,* and *Melvin A. Albert* were on the brief, for petitioners.

460

*Solicitor General Biddle,* with whom *Assistant Attorney General Arnold* and *Messrs. James C. Wilson* and *Wilber Stammler* were on the brief, for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The Circuit Court of Appeals, with modifications not here challenged, affirmed a Federal Trade Commission decree ordering petitioners to cease and desist from certain practices found to have been done in combination and to constitute "unfair methods of competition" tending to monopoly.[1]  Determination of the correctness of the decision below requires consideration of the Sherman, Clayton, and Federal Trade Commission Acts.[2]

---

[1] 114 F. 2d 80. Because of inconsistency between the holding below and that of the First Circuit Court of Appeals in *Wm. Filene's Sons Co.* v. *Fashion Originators' Guild of America,* 90 F. 2d 556, we granted certiorari.  311 U. S. 641.

[2] 26 Stat. 209, 15 U. S. C. § 1 *et seq.;* 38 Stat. 730, 15 U. S. C. § 12 *et seq.;* 38 Stat. 717, 15 U. S. C. § 41 *et seq.*

Some of the members of the combination design, manufacture, sell and distribute women's garments—chiefly dresses. Others are manufacturers, converters or dyers of textiles from which these garments are made. Fashion Originators' Guild of America (FOGA), an organization controlled by these groups, is the instrument through which petitioners work to accomplish the purposes condemned by the Commission. The garment manufacturers claim to be creators of original and distinctive designs of fashionable clothes for women, and the textile manufacturers claim to be creators of similar original fabric designs. After these designs enter the channels of trade, other manufacturers systematically make and sell copies of them, the copies usually selling at prices lower than the garments copied. Petitioners call this practice of copying unethical and immoral, and give it the name of "style piracy." And although they admit that their "original creations" are neither copyrighted nor patented, and indeed assert that existing legislation affords them no protection against copyists, they nevertheless urge that sale of copied designs constitutes an unfair trade practice and a tortious invasion of their rights. Because of these alleged wrongs, petitioners, while continuing to compete with one another in many respects, combined among themselves to combat and, if possible, destroy all competition from the sale of garments which are copies of their "original creations." They admit that to destroy such competition they have in combination purposely boycotted and declined to sell their products to retailers who follow a policy of selling garments copied by other manufacturers from designs put out by Guild members. As a result of their efforts, approximately 12,000 retailers throughout the country have signed agreements to "coöperate" with the Guild's boycott program, but more than half of these signed the

agreements only because constrained by threats that Guild members would not sell to retailers who failed to yield to their demands—threats that have been carried out by the Guild practice of placing on red cards the names of non-coöperators (to whom no sales are to be made), placing on white cards the names of coöperators (to whom sales are to be made), and then distributing both sets of cards to the manufacturers.

The one hundred and seventy-six manufacturers of women's garments who are members of the Guild occupy a commanding position in their line of business. In 1936, they sold in the United States more than 38% of all women's garments wholesaling at $6.75 and up, and more than 60% of those at $10.75 and above. The power of the combination is great; competition and the demand of the consuming public make it necessary for most retail dealers to stock some of the products of these manufacturers. And the power of the combination is made even greater by reason of the affiliation of some members of the National Federation of Textiles, Inc.—that being an organization composed of about one hundred textile manufacturers, converters, dyers, and printers of silk and rayon used in making women's garments. Those members of the Federation who are affiliated with the Guild have agreed to sell their products only to those garment manufacturers who have in turn agreed to sell only to coöperating retailers.

The Guild maintains a Design Registration Bureau for garments, and the Textile Federation maintains a similar Bureau for textiles. The Guild employs "shoppers" to visit the stores of both coöperating and non-coöperating retailers, "for the purpose of examining their stocks, to determine and report as to whether they contain . . . copies of registered designs . . ." An elaborate system of trial and appellate tribunals exists, for the determination of whether a given garment is in fact a copy of

a Guild member's design. In order to assure the success of its plan of registration and restraint, and to ascertain whether Guild regulations are being violated, the Guild audits its members' books. And if violations of Guild requirements are discovered, as, for example, sales to red-carded retailers, the violators are subject to heavy fines.[3]

In addition to the elements of the agreement set out above, all of which relate more or less closely to competition by so-called style copyists, the Guild has undertaken to do many things apparently independent of and distinct from the fight against copying. Among them are the following: the combination prohibits its members from participating in retail advertising; regulates the discount they may allow; prohibits their selling at retail; coöperates with local guilds in regulating days upon which special sales shall be held; prohibits its members from selling women's garments to persons who conduct businesses in residences, residential quarters, hotels or apartment houses; and denies the benefits of membership to retailers who participate with dress manufacturers in promoting fashion shows unless the merchandise used is actually purchased and delivered.

If the purpose and practice of the combination of garment manufacturers and their affiliates runs counter to the public policy declared in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it as an unfair method of competition.[4] From

---

[3] In one instance a fine of $1500 was imposed, and the Guild notified its membership that a fine of $5000 would be assessed in case of future violation.

[4] *Federal Trade Comm'n* v. *Beech-Nut Packing Co.*, 257 U. S. 441, 453–455. See 26 Stat. 209, 15 U. S. C. § 1 *et seq.*; 38 Stat. 730, 15 U. S. C. § 12 *et seq.*; 38 Stat. 717, 15 U. S. C. § 41 *et seq.* By 38 Stat. 734, 15 U. S. C. § 21, the Federal Trade Commission is expressly given authority to enforce the Clayton Act.

its findings the Commission concluded that the petitioners, "pursuant to understandings, arrangements, agreements, combinations and conspiracies entered into jointly and severally" had prevented sales in interstate commerce, had "substantially lessened, hindered and suppressed" competition, and had tended "to create in themselves a monopoly." And paragraph 3 of the Clayton Act (15 U. S. C. § 14) declares "It shall be unlawful for any person engaged in commerce, . . . to . . . make a sale or contract for sale of goods, . . . on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods, . . . of a competitor or competitors of the . . . seller, where the effect of such . . . sale, or contract for sale . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce." The relevance of this section of the Clayton Act to petitioners' scheme is shown by the fact that the scheme is bottomed upon a system of sale under which (1) textiles shall be sold to garment manufacturers only upon the condition and understanding that the buyers will not use or deal in textiles which are copied from the designs of textile manufacturing Guild members; (2) garment manufacturers shall sell to retailers only upon the condition and understanding that the retailers shall not use or deal in such copied designs. And the Federal Trade Commission concluded in the language of the Clayton Act that these understandings substantially lessened competition and tended to create a monopoly. We hold that the Commission, upon adequate and unchallenged findings, correctly concluded that this practice constituted an unfair method of competition.[5]

---

[5] Cf. *Federal Trade Comm'n* v. *R. F. Keppel & Bro.*, 291 U. S. 304, 314; *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 357.

Not only does the plan in the respects above discussed thus conflict with the principles of the Clayton Act; the findings of the Commission bring petitioners' combination in its entirety well within the inhibition of the policies declared by the Sherman Act itself. Section 1 of that Act makes illegal every contract, combination or conspiracy in restraint of trade or commerce among the several states; § 2 makes illegal every combination or conspiracy which monopolizes or attempts to monopolize any part of that trade or commerce. Under the Sherman Act "competition not combination, should be the law of trade." *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, 129. And among the many respects in which the Guild's plan runs contrary to the policy of the Sherman Act are these: it narrows the outlets to which garment and textile manufacturers can sell and the sources from which retailers can buy (*Montague & Co.* v. *Lowry,* 193 U. S. 38, 45; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 48–49); subjects all retailers and manufacturers who decline to comply with the Guild's program to an organized boycott (*Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, 609–611); takes away the freedom of action of members by requiring each to reveal to the Guild the intimate details of their individual affairs (*United States* v. *American Linseed Oil Co.,* 262 U. S. 371, 389); and has both as its necessary tendency and as its purpose and effect the direct suppression of competition from the sale of unregistered textiles and copied designs (*United States* v. *American Linseed Oil Co., supra,* at 389). In addition to all this, the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus "trenches upon the power of the national legislature and violates the statute."

*Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 242.

Nor is it determinative in considering the policy of the Sherman Act that petitioners may not yet have achieved a complete monopoly. For "it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 16; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 237. It was, in fact, one of the hopes of those who sponsored the Federal Trade Commission Act that its effect might be prophylactic and that through it attempts to bring about complete monopolization of an industry might be stopped in their incipiency.[6]

Petitioners, however, argue that the combination cannot be contrary to the policy of the Sherman and Clayton Acts, since the Federal Trade Commission did not find that the combination fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality. But action falling into these three categories does not exhaust the types of conduct banned by the Sherman and Clayton Acts. And as previously pointed out, it was the object of the Federal Trade Commission Act to reach not merely in their fruition but also in their incipiency combinations which could lead to these and other trade restraints and practices deemed undesirable. In this case, the Commission found that the combination exercised sufficient control and power in the women's garments and textile businesses "to exclude from the industry those manufacturers and distributors who do not conform to the rules and regulations of said respondents, and thus tend to

---

[6] *Federal Trade Comm'n* v. *Raladam Co.,* 283 U. S. 643, 647. And see remarks of Senator Cummins, Chairman of the Committee which reported the bill, 51 Cong. Rec. 11455, quoted by Brandeis, J., in *Federal Trade Comm'n* v. *Gratz,* 253 U. S. 421, 435.

create in themselves a monopoly in the said industries."
While a conspiracy to fix prices is illegal, an intent to
increase prices is not an ever-present essential of conduct
amounting to a violation of the policy of the Sherman
and Clayton Acts; a monopoly contrary to their policies
can exist even though a combination may temporarily
or even permanently reduce the price of the articles
manufactured or sold. For as this Court has said,
"Trade or commerce under those circumstances may
nevertheless be badly and unfortunately restrained by
driving out of business the small dealers and worthy men
whose lives have been spent therein, and who might be
unable to readjust themselves to their altered surround-
ings. Mere reduction in the price of the commodity
dealt in might be dearly paid for by the ruin of such a
class, and the absorption of control over one commodity
by an all-powerful combination of capital." [7]

But petitioners further argue that their boycott and
restraint of interstate trade is not within the ban of the
policies of the Sherman and Clayton Acts because "the
practices of FOGA were reasonable and necessary to pro-
tect the manufacturer, laborer, retailer and consumer
against the devastating evils growing from the pirating
of original designs and had in fact benefited all four."
The Commission declined to hear much of the evidence
that petitioners desired to offer on this subject. As we
have pointed out, however, the aim of petitioners' com-
bination was the intentional destruction of one type of
manufacture and sale which competed with Guild mem-
bers. The purpose and object of this combination, its
potential power, its tendency to monopoly, the coercion
it could and did practice upon a rival method of compe-
tition, all brought it within the policy of the prohibition

---

[7] *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290,
323.

declared by the Sherman and Clayton Acts. For this reason, the principles announced in *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, and *Sugar Institute* v. *United States,* 297 U. S. 553, have no application here. Under these circumstances it was not error to refuse to hear the evidence offered, for the reasonableness of the methods pursued by the combination to accomplish its unlawful object is no more material than would be the reasonableness of the prices fixed by unlawful combination. Cf. *Thomsen* v. *Cayser,* 243 U. S. 66, 85; *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 398; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 212–224. Nor can the unlawful combination be justified upon the argument that systematic copying of dress designs is itself tortious, or should now be declared so by us. In the first place, whether or not given conduct is tortious is a question of state law, under our decision in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. In the second place, even if copying were an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of federal law. And for these same reasons, the principles declared in *International News Service* v. *Associated Press,* 248 U. S. 215, cannot serve to legalize petitioners' unlawful combination. The decision below is accordingly

*Affirmed.*