KEASBEY & MATTISON CO. et al. v. FEDERAL TRADE COMMISSION.

NORRISTOWN MAGNESIA & ASBESTOS CO. et al. v. SAME.

ACME ASBESTOS COVERING & FLOORING CO. et al. v. SAME.

PLANT RUBBER & ASBESTOS WORKS v. SAME.

Nos. 9826–9829.

Circuit Court of Appeals, Sixth Circuit.

Feb. 17, 1947.

---

942

Philip L. Leidy, of Philadelphia, Pa., (John J. Kelly, John J. Kelly, Jr. and George Gilman Kelly, all of Chicago, Ill. on the brief), for petitioner Standard Asbestos Mfg. Co.

John Sailer and Philip L. Leidy, both of Philadelphia, Pa., (Pepper, Bodine & Stokes, of Philadelphia, Pa., and Taft,. Stettinius & Hollister, of Cincinnati, Ohio, of counsel), for petitioner Keasbey & Mattison Co.

Albert L. Wolfe and Cyrus B. Austin, both of New York City, Moses Lasky, Herman Phleger, and Theodore R. Meyer, all of San Francisco, Cal., and Richard D. Daniels, of Washington, D.C. (Guy George Gabrielson and Cadwalader, Wickersham & Taft, all of New York City, on the brief; Albert L. Wolfe, F. Sims McGrath, and Cyrus Austin, all of New York City and Taft, Stettinius & Hollister, of Cincinnati, Ohio, of counsel), for other petitioners.

W. T. Kelley, Walter B. Wooden and Floyd O. Collins, all of Washington, D.C., for respondent.

Before HICKS, ALLEN and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

The petitioner corporations,[1] which compete with each other in the manufacture, processing, sale and interstate distribution of insulating materials and insulating articles fabricated therefrom, were charged with entering into an agreement with each other and petitioner Donald Tulloch, Jr., prior to and during the year 1934, for the purpose and intent and with the effect of substantially restricting and eliminating competition in price and otherwise in the sale and distribution of insulating material and products, including asbestos paper, plain and corrugated asbestos roll board, wool felt and sponge felt paper, pipe coverings, boiler jackets, sheets and blocks. Petitioners were found to have violated § 5 of the Federal Trade Commission Act, Title 15 U.S.C.A. § 41 et seq., 15 U.S.C.A. § 41 et seq., which declares unlawful, § 45(a) "unfair methods of competition in commerce * * *," and were ordered to cease and desist from the practices described in the findings.

The case arises out of the following facts found by the Commission, and for the most part uncontradicted.

On June 26, 1933, the members of the asbestos industry, including the petitioner corporations, acting under the National Industrial Recovery Act, 48 Stat. 195, formulated a code and merchandising plan applicable to the sale of their insulating products. All of the petitioner corporations were included in the Asbestos Paper and Allied Products Division of the Asbestos Industry. Petitioner Tulloch does not manufacture nor distribute the products involved, but had been connected with the industry since 1922, and was secretary manager of the division under the code. The petitioners operated in accordance with the code, and the merchandising plan, from November 1, 1933, until May 27, 1935.

The merchandising plan covered all sales of pipe covering by members in all parts of the United States except a specified zone on the Pacific Coast. It established and

---

[1] Petitioners' names are abbreviated throughout this opinion.

defined classes of buyers and required its members to submit the names of their customers to a merchandising committee of the division. It was the duty of the committee to investigate the lists of customers submitted by the members and if the committee found such customers to be properly classified, they were added to what was known as a "Master" classified list which was to be available to the members of the division. There was a provision for the addition to or deletion from such "Master" list by the code manager.

Definitions were established in the merchandising plan for carload, mixed car, stopover car, and less-than-carload shipments with prohibitions against hiring the trucks of customers or renting trucks of customers or making allowances for trucking charges where the material was picked up at the factory or warehouse by customers' trucks. Factory points, metropolitan areas and manufacturers' warehouses were defined and units of sale were established. Sales were required to be made at prices derived from one standard list price. Price differentials were fixed as between different thicknesses of covering and different types of construction, as between the different geographical zones, and as between the various classifications of purchasers. Price differentials were fixed for differences in weight of canvas used on pipe coverings or waterproof jackets and for various types of bands. Procedures were established for many details in the handling of quotations and shipments as well as the treatment of different classes of customers following an advance or decline in price. The method of determining warehouse prices was specified. The terms of payment, including cash discounts to different classes of buyers, were fixed. Important features of contracts were standardized. Consignment of stocks and the selling of sub-standard materials below the normal selling schedule of the manufacturer were prohibited. Territorial zones were defined for the purpose of determining freight allowances and similarly detailed schedules applied to other products.

Following the decision of the Supreme Court in A. L. A. Schechter Poultry Corp. v. United States, May 27, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, which declared vital provisions of the National Industrial Recovery Act unconstitutional, certain of the petitioners assisted in preparing a voluntary agreement to continue many features of the code, including the filing of prices and adherence to the prices and terms filed. The agreement was not approved by the Government and never became operative.

Petitioners Johns-Manville, Norristown, Carey, Keasbey & Mattison, and Empire filed price schedules with petitioner Tulloch under the N.R.A. Code, and as manager for the Asbestos Paper Division he distributed them to other manufacturers. As a result of the price filing, prices tended to become uniform, for each company set its prices to meet the published price.

Since September, 1931, an application for patent had been pending upon the process of manufacturing water-repellent and shrink-proof asbestos paper and asbestos pipe covering. Johns-Manville had done the experimental research and development of this patent, and expended about $20,000 upon it. The patent, No. 1,972,500 (hereinafter called the Toohey patent), issued September 4, 1934 to Earl L. Williams and Edward Toohey, was assigned to Johns-Manville, which gave an exclusive license to Tulloch on September 11, 1935. The license gave Tulloch the exclusive right to sub-license others, and required payment by him of $1,250 a year to Johns-Manville. He immediately gave a non-exclusive sub-license to Johns-Manville, and then proceeded to sub-license the respondents below, including all of the petitioners in this court.

The essential feature of the Toohey patent is that it covers an insulating product into which a wax sizer composed of paraffin and other ingredients has been beaten, rendering it water-repellent and shrink-proof. The invention solved an industry problem and created a superior product. However, it is agreed that the various products involved in this case which after the license were manufactured under the Toohey patent, prior to Toohey were manufactured without the use of the sizer, and after the

issuance of the patent could be, and often were, manufactured without using the sizer.

While he was still manager of the Asbestos Paper and Allied Products Division under the N.R.A. Code, Tulloch had tried to interest members of the industry in entering into a licensing system and merchandising plan. He consulted with Johns-Manville and other petitioners as to the details of such an agreement, appointed an advisory committee with representatives of Johns-Manville, Carey, Ruberoid, Norristown, and Keasbey & Mattison, to consider a merchandising plan, and called meetings of various members of the industry to consider the matter months before Johns-Manville issued its exclusive license to him..

In connection with the license and sublicenses, a merchandising plan similar to that adopted under the N.R.A. Code was formulated by Tulloch after consultation with the petitioners, and put into effect. While special conditions were attached to the sale. of different licensed products, in substance the plan among other things, (a) fixed the price at which and the conditions under which the products were to be sold; (b) required uniform classification of customers for pricing purposes; (c) fixed differentials in prices between different classes of customers; (d) required contracts for the sale of such products to be uniform in substance; (e) zoned the country, or large parts thereof, into territorial zones for pricing purposes and required certain items of such products to be sold at delivered zone prices; (f) designated standards for the size and thickness of certain products and fixed the differential in prices between such products of different size and thickness; (g) provided for equalization of delivered prices through freight equalization on standard products and designation of certain specific cities from which freight should be figured in equalizing freight; (h) provided for rigid enforcement of the provisions of the merchandising plan and price schedule and for the imposition of penalties for digression; (i) required a uniform method of computing prices through the use of so-called "Manual of Unit Prices" for pipe covering and insulating blocks.

All the licensees conformed to the requirements of the merchandising plan. Changes were made from time to time in its provisions as to prices and terms of sale, after consideration by and consultation with the important members of the industry. The Commission found that the merchandising plan in general outline and in many details was simply a re-establishment with additions of the merchandising plan created by the petitioners and others under N.R.A. It found the principal differences to be largely a matter of degree rather than principle, and stated that the present plan substitutes direct price-fixing for price reporting, stops some loopholes for competition which existed in the N.R.A. plan, and provides some direct and effective means of enforcement. With reference to the combination and conspiracy, it found that "The respondent sublicensees who did not participate in the organization of the licensing system could not have remained ignorant of the fact that the merchandising plan was being administered upon the basis of cooperation, agreement, and understanding between and among the sublicensees and the licensor. The numerous communications from Mr. Tulloch to all his licensees alone make this plain, without reference to other negotiations and meetings." Its final finding and conclusion was "that the license from Johns-Manville to Mr. Tulloch was granted and the patent-licensing and merchandising plan heretofore described was established as a part of and as a means of effectuating the combination and conspiracy entered into and maintained by the respondents herein in the manner aforesaid. It further finds that the capacity, tendency, and effect of said combination and conspiracy and the acts and practices performed thereunder and in connection therewith by said respondents as set out herein has been, and is, to lessen, restrain, and suppress competition in the sale and distribution of pipe covering and other insulating materials as described herein, among, and between the several States of the United States; to fix and maintain prices, terms, and conditions of sale for such materials and to deprive purchasers of such materials of benefits of competition in price; to collectively determine and establish classifica-

tions of customers for pricing purposes, and fix and determine price differentials as among such classes; to create substantial uniformity in contracts of sale and in terms and conditions specified therein; to determine and maintain uniform delivered prices on certain insulating materials; to determine and maintain uniform delivered costs to particular purchasers through a freight-equalization plan based upon specified equalization points; to determine and maintain geographical zones within which prices of certain insulating materials were made uniform, and using such zones so established for pricing purposes; to establish standard construction, size, and thickness specifications of products to facilitate price fixing thereon; and otherwise to promote and maintain their price-fixing combination and conspiracy and obstruct, lessen, and defeat any form of competition which threatened the maintenance and purpose of said combination and conspiracy."

The cease and desist order was based upon these findings.

The petitioners contend that there is no evidence of conspiracy to fix or stabilize unpatented materials; that the licensing and price control under the Toohey patent neither caused nor tended to cause suppression of competition; that the license control exercised under the patent did not unlawfully restrain competition, and that the order in any case should be set aside because all licensees except one had voluntarily abandoned their licenses prior to the filing of the complaint.

■ Petitioners also contend that the amended complaint charges a price-fixing conspiracy only as to materials embodying the Toohey invention, flexible range boiler jackets and accessories, and that it was not alleged that the patent-licensing plan and merchandising system were established as a means of carrying out a conspiracy to restrict competition in unpatented insulating materials. Hence they urge that the order is broader than the amended complaint and should be modified. We think that this contention has no merit. The complaint avers that the petitioners manufacture and sell from eighty to ninety per cent of the low pressure asbestos pipe covering manufactured and sold in the United States, and that the conspiracy covers both licensed and unlicensed materials. Certain items are listed specifically in a phrase which reads: "Non-licensed materials include such items as: solid brass, zinc, and lacquered bands, flexible range boiler jackets and canvas covering." This provision, petitioners aver, limits "non-licensed materials" to the items stated. This contention ignores the use of the word "includes," which clearly indicates that other non-licensed materials are covered by the amended complaint, as well as those listed. It also ignores the allegation that "Both licensed and non-licensed materials are embodied, involved and employed in the manufacture, use and sale of such covering." The word "embodied" is used in a similar connection several times in the amended complaint. The bands and the canvas covering which are placed on the outside of the products involved can hardly be said to be embodied in the manufacture of the pipe covering. The term "embodied" under this record applies to materials and it is so specifically interpreted in the phrase "of both licensed and non-licensed materials and also of the low pressure asbestos covering embodying such materials." This is an additional and cogent reason for concluding that the amended complaint charges conspiracy with reference to non-licensed materials generally.

■ Nor are we impressed with the contention that in substituting for the word "unlicensed" in the complaint the word "non-licensed," which is used for the most part in the amended complaint, the Commission indicated an intention to limit the charge of restraint of trade in unpatented materials to range boiler jackets and accessories. While Webster's Dictionary makes a distinction between the prefix "un" and the prefix "non," the latter being a more negative term than the former, for the purposes of this case unlicensed and non-licensed have equivalent meanings. They mean that the articles which they describe are not licensed. The Toohey patent is an article patent, whose claims are covered by the sub-license agreements. Whatever product involved herein is not licensed or "non-licensed" for the purpose of this con-

troversy is "unpatented." The specific charge of the amended complaint is that pursuant to and in furtherance of the alleged combination and conspiracy, Tulloch and the petitioners agreed "upon the inclusion of non-licensed materials to be covered by said merchandising plan [the Tulloch merchandising plan] and thereby" fixed "the prices, terms and conditions of sale of said materials." The complaint clearly covers unpatented, as well as patented materials.

◼◼ Moreover, the practices charged, if proven, constitute an "unfair method of competition" within the meaning of § 5 of the Act, Title 15, § 45(a); Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534. The fact that these practices also constitute a violation of the Sherman Act, Title 15 U.S.C., § 1 et seq., 15 U.S.C.A. § 1 et seq., does not deprive the Commission of jurisdiction. In fact the public policy evinced in the Sherman Act is to be considered in determining what are unfair methods of competition under the Federal Trade Commission Act. Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 453, 42 S.Ct. 150, 154, 66 L.Ed. 307, 19 A.L.R. 882. That case held that a system of merchandising which had a "dangerous tendency unduly to hinder competition or create monopoly" fell within the jurisdiction of the Commission. A recent decision holding that the suppression of competition constitutes an unfair method of competition within § 5 of the Federal Trade Commission Act is Fashion Originator's Guild of America, Inc., v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949.

Certain of the specific methods employed by petitioners under their merchandising plan have been held to constitute evidence of unlawful combination, such as the use of uniform price lists (Federal Trade Commission v. Pacific States Paper Trade Ass'n, supra); an agreed nation-wide zone system for fixed delivery prices [Salt Producers Ass'n v. Federal Trade Commission, 7 Cir., 134 F.2d 354]; a freight equalization plan [Milk and Ice Cream Can Institute v. Federal Trade Commission, 7 Cir., 152 F.2d 478].

If the facts found by the Commission are supported by the record, the cease and desist order is lawful.

◼◼ Congress has left to the Commission the determination of the facts. Federal Trade Commission v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338. The weight to be attributed to the facts proven and the inferences to be drawn from them are for the Commission to determine. Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320. We think the record presents evidence of a combination and conspiracy to fix and stabilize prices and to restrict competition both as to patented and unpatented materials in the asbestos industry.

It is significant that the transactions detailed in the voluminous record are set off against a background of concerted price fixing and elimination of competition. Tulloch's negotiations for a licensing system and merchandising plan were begun while N.R.A. was in effect, and were carried on during the period following the Schechter decision while the voluntary plan was being considered. As found in Socony-Vacuum Oil Co. v. United States, 310 U.S. 150, 160, 60 S.Ct. 811, 84 L.Ed. 1129, the N.R.A. provided for a price-fixing system. The petitioners were members of the same division operating under the N.R.A. code applicable to the asbestos industry, and Tulloch was the executive manager of the division. After the invalidation of the Act by the decision in the Schechter case, the most important manufacturers in the group, including five of the petitioners, made a voluntary agreement which contemplated the fixing of prices, although it never became operative.

Declarations of certain petitioners conclusively demonstrate that they desired to continue the stabilization of the industry and the price control which had existed under the N.R.A. Johns-Manville entered the combination at a distinct financial sacrifice. It owned the Toohey patent, had spent about $20,000 in developing it, and gave up its exclusive rights for a meager compensation of $1,250 a year. The other petitioners, judging from their conduct,

did not enter into the sub-license contracts primarily for the sake of being able to use a superior product. None of them except Johns-Manville advertised or pushed the patented shrink-proof asbestos products in any substantial way. Acme "mentioned" them in one of its catalogues. It was Carey's policy never to mention them, and to supply them only upon request. Various jobbers testified that they had never heard of the pre-shrunk material. Typical of petitioners' attitude in considering the licensing system was that of Keasbey & Mattison, which stated that it would consider becoming a licensee of Norristown under the range boiler jacket patent if "everybody of importance" did likewise.

A principal point stressed by Tulloch in endeavoring to sell the idea of the licensing system was the stabilization of the industry. Morgan, of Chicago, said Tulloch urged this point upon him prior to the issuance of the Toohey patent. It was the understanding at least of certain licensees that this was the great advantage in entering the group. Officials of Atlantic and Clark made direct statements to this effect. Ozurovich, of Atlantic, said to a federal investigator that in taking the license he realized the unusual advantage "because of the price control which legally carried pursuant to the agreement." Ozurovich carried out this price control as to unpatented material. Mladinich, office manager of Atlantic, said that he understood "the whole thing was merely a method used by the industry for every one to stabilize asbestos prices." He had attended various meetings with members of the industry when prices and terms of sale, as well as zoning for the continuation of further equalization, were discussed. These meetings were usually the result, he stated, of price confusion in the New York area.

It was natural that the petitioners should desire to retain the stabilized price system of N.R.A. They had known its advantages. That they did seriously consider restricting the output of unpatented material is shown by the fact that a proposed draft of the license contained a restriction against selling asbestos pipe covering "which does not embody, employ or contain the invention." The license was finally drafted without this provision. However, the license contained a provision that it could be cancelled if the licensee sold unpatented material so as to interfere with the patented product. Evidently there was a gentleman's agreement that the proposed provision forbidding the selling of unpatented pipe covering should be carried out, for letters were sent to licensees ordering them to dispose of unpatented material by December 31, 1935. A copy of the letter sent to Standard October 29, 1935, is as follows:

"This is to notify you that prices, terms, and conditions of sale, as specified in schedules being forwarded under separate cover, on all products manufactured under U.S. Letters Patent No. 1,972,500 are to be made effective November 1, 1935.

"It is understod that contracts and protections exist and that manufacturers should have a reasonable period in which to take care of these protections and to dispose of existing stocks of non-patented materials.

"You are at liberty to dispose of non-patented stocks and to take care of commitments up to December 31, 1935 after which date, you will manufacture and sell licensed materials only on the basis of the licensed schedules."

A practically identical letter was sent to Asbestos Insulating Materials, Inc., on the same day.

That these restrictions were enforced by Tulloch is shown by a letter sent "To Licensees" on January 15, 1936, stating that a Philadelphia firm was reselling low-pressure covering at prices which indicated that it must be buying at lower than the license schedules. Tulloch asked the licensees whether they had any contacts with the Philadelphia firm, and concluded "Of course it is possible that they may be operating from an old stock, and in view of the fact that this can not continue indefinitely, it seems to be worth investigating."

A basic fact in this case is that most of the asbestos paper products could be made either under the Toohey patent or without the use of the wax sizer, in which case they were made of unpatented materials. Many of the licensees under the Toohey patent manufactured or processed both

patented and unpatented paper. The price lists for the patented products were used for the unpatented products, without any differentiation. They bore no statement indicating that the printed lists were for pre-shrunk material; but the prices they carried were the prices set for pre-shrunk material which were higher than the prices for the unpatented material. Petitioners explain that it would be unreasonable to have two sets of price lists, and contend that as a matter of fact the unpatented materials were always sold at prices substantially lower than the patented materials, even though the same price lists were used. But this was not always the case. Ozurovich, of Atlantic, told a federal agent that he bought a small amount of wax sizer for use in the Toohey process, but never used all of it. Although Atlantic was a licensee, it continued to manufacture asbestos paper without employing the Toohey method, continued to pay royalties to Tulloch under the license, and charged substantially the same prices for the unlicensed as were charged for the licensed paper. Steffens said that Carey followed the Tulloch price schedule on items on which "it paid no royalty." He also said that Carey paid royalty on aircell boards which petitioners concede are unpatented. It is a fair inference that if royalty was paid, the license price was charged. Evidence to the same general effect exists in a contract between Acme and one of its purchasers, which contained the following provision: "The seller agrees to sell the buyer asbestos . . . and other licensed and unlicensed insulating material according to the terms and conditions of the license agreement." Collopy stated that Acme had no license agreement with this purchaser.

Tulloch's memoranda were sent in many instances to "all licensees," and he never altered prices without consulting the licensees immediately concerned. He set up the price lists and distributed them. They were sent to and adhered to even by non-licensees, and in such case they were applied to transactions not properly covered by the Toohey price schedules. Ehret, a non-licensee, asked for the price lists, stating "If you expect the Ehret Company to live up to the letter of your Merchandise Plan it is going to be necessary for you to send direct to us any memos or rulings, particularly regarding change in price or price clarification. * * * We realize we are not a Licensee under your patent but we are desirous of living up to all the rules and regulations just as if we were, but we can not do it unless we get the information just as soon as all Licensees get it."

Clark, also before it was a licensee, wrote to Tulloch:

"Not having received any further correspondence since November 14th, 1935, we are anxious to know if the present set-up on low pressure covering is in effect now.

"The reason we ask, is that we have been following prices as you laid down and find that our competitors are not doing this. In fact, the Poewils Asbestos Company has stated that they had not received any new prices and are still quoting the old."

Clark became a licensee January 22, 1936. It cancelled the license in 1938 but continued to adhere to the Tulloch price schedule.

The Commission reproduced in its findings a number of letters relating to the range boiler jacket which was manufactured by a number of the petitioners under license from Norristown. Judging by the space devoted to these communications, the Commission considered them highly important, but in its general findings and conclusions it did not specifically indicate the connection of the range boiler jacket transaction with the conspiracy. It found that the price for boiler jackets included unpatented articles such as bands, staples, and asbestos cement, and that by establishing price differentials on the same pipe covering when different weights of canvas were used, when different kinds of bands were supplied, and when waterproof jackets were furnished, as well as for unpatented articles used with boiler jackets, prices were fixed for the unpatented articles. The petitioners maintain that the whole transaction of the range boiler jackets is irrelevant and insignificant; but this was a matter for the Commission to decide.

We think the Commission did not err in its conclusion that the range boiler jacket

transaction presented important evidence relevant to this proceeding. The boiler jacket is an asbestos pipe covering which is used principally for insulating household hot water tanks. The patent involved was issued to Grant Williams March 2, 1933, and assigned to Norristown. It discloses a jacket made of laminated asbestos sheets which are flexible and collapsible, and therefore can be packed in much smaller space than the rigid type, greatly reducing the expense of packing. Norristown, on August 20, 1933, licensed Carey under this patent, the contract including no provision for price control. Later licenses were issued, including one to Johns-Manville, executed February 4, 1934, and licenses to Ruberoid, Sall Mountain and Keasbey & Mattison in 1938, all of which embodied a price-control provision. Norristown twice requested Tulloch to assist in securing other licensees for it under the range boiler patent, but no contract was executed between them, and Tulloch secured no licensees. However, in 1936 Norristown ceased to issue its own price lists on the flexible jacket, and Tulloch included this item in his price lists under the Toohey patent. As was the case with other asbestos pipe covering, the range boiler jackets could be made under Toohey or they could be made without use of the wax treatment, in which case they were not properly subject to the provisions of the Toohey license. Carey made certain systematic efforts to indicate on its invoices whether or not the products sold were manufactured or treated under the Toohey patent, using the words "No wax treatment" on a large number of its invoices.

The letters embodied in the Commission's findings show that Johns-Manville was insistent that other principal manufacturers should be secured as licensees under the Norristown patent, with contracts embodying price control. Johns-Manville was a royalty-paying licensee, and its inordinate interest in the securing of licensees among other manufacturers by Norristown is significant and has bearing on the question of intent. The correspondence plainly shows that the uppermost consideration, in the execution of the Norristown licenses just as in the case of the Toohey licenses, was not

the use of a superior product which would effect great savings in freight and packing, but was the establishment of price control or "stabilization" in the sale of this important article.

The choice of Tulloch, who was the dictator of price control under Toohey, to secure licenses and to establish the price schedules for Norristown, is also significant. When asked why Tulloch was chosen to perform this particular service, the president of Norristown twice stated that Tulloch was chosen because he had failed to get Norristown any license. This would seem properly to be a reason for not employing Tulloch rather than for employing him. When Tulloch included the boiler jackets in his price schedules under the Toohey sublicenses, at higher prices than Norristown's, that company ceased to publish its own price lists on this article.

The petitioners do not seriously challenge the Commission's finding that by their fixing prices on accessories to the range boiler jackets, competition on unpatented articles was restricted. This fact alone, in addition to the circumstances above set forth, makes the range boiler transaction relevant.

An impressive part of the record dealing with restriction of competition in unpatented material relates to transactions in air cell board, and strongly supports the Commission's order upon this point. The reply brief filed on behalf of 13 of the petitioners, including Atlantic, Carey, Johns-Manville, Ruberoid and Tulloch, concedes that air cell board was not a licensed material, pointing out that it is not listed among the materials described in the complaint or in the findings. If air cell board, therefore, was subjected to the price control applied to licensed material, that constitutes substantial evidence of an agreement to impose upon certain unpatented material the rigid price regimentation applicable under the special licenses to the licensed products. The petitioners concede that Burgstresser, of Norristown, sent a letter to Tulloch dated February 24, 1936, suggesting that "the industry should reprice" certain air cell board. They endeavor to wipe out the inference of combination and conspiracy

arising from this communication by stating that the undisputed evidence is that Tulloch refused to act on this request, and that there is no evidence of any such action ever having been taken on the matter. This contention, however, is contradicted by the record. Tulloch stated categorically that he told Burgstresser orally, in response to this letter, that "we were no longer operating under N.R.A.," and that he, Tulloch, could do nothing. He testified that he had never established a price on air cell board, and that so far as he was aware, Norristown was the only company that had ever manufactured the material. This is hardly credible in view of the fact that Collopy, of Acme, wrote him about this time in regard to the packing of air cell board. Invoices in evidence show that air cell board was sold by Carey and Johns-Manville. The correspondence clearly shows that Tulloch must have known that the licensees generally were concerned about the handling of air cell board. In response to a question as to whether he had taken up the matter with any other member of the industry, Tulloch said "No, I did not." When questioned by the examiner as to what the product was of which he was making this statement, he called it a "specialty item," and avoided calling it air cell board.

As a matter of fact, the letter dated February 24, 1936, was not the first communication from Burgstresser of Norristown to Tulloch with reference to this subject. A letter dated February 7, 1936, asked Tulloch about charges for packing on air cell board, and the same question had been raised with Tulloch on February 5, 1936, by Collopy, of Acme. This letter of Collopy's shows on its face that it is in answer to a letter from Tulloch. On March 25, 1936, Tulloch sent out a communication "To All Licensees," which was headed:

"General—Air cell board.
 Silicated or taped edges.
 Heat-resisting coatings."

The communication continued that an investigation of costs on the special treatments above indicates that extra charges should be made, lists the charges, and asks for comment by return mail.

On April 9, 1936, Tulloch wrote to licensees in effect that a licensee had complained that "the Equipment Account basis will now be given on air cell board to almost any type of buyer in the absence of a definite list of Equipment Accounts.

"There has always been objection to publication of such a list."

Tulloch says that the complainant requests that a list be established which covers accounts that actually make and sell a product containing air cell board. Tulloch asks for the "serious and immediate consideration of this thing, as it is a problem," and concludes "Please let me hear from you at your earliest convenience."

Tulloch sent out a notice for the meeting to be held May 14, 1936, which listed among the subjects for discussion at the meeting, "(1) Air-cell Board—Listing of Equipment Accounts." On September 22, 1936, he sent a notice to all licensees headed "General—Cut size Boards Equipment Accounts," and suggests the figuring of certain definite prices of cut sizes to equipment manufacturers. He sent out a notice for a meeting to be held in New York on March 25, 1937, headed "Agendum for Low Pressure Meeting." The first subject for consideration was "Air cell Boards—Equipment Accounts—Redefinition." The fifth subject was "Air cell Boards to Rehandlers who sell for Air-Conditioning."

While the Commission lists a few of these exhibits in its findings it is in another connection, and neither the findings nor the Commission's brief point out these dealings as specific evidence of conspiracy to restrain competition in unpatented materials.

Yet it is conclusively established that the price of air cell board conceded to be unpatented material, and of the packing which made part of the expense of handling this item called forth a number of communications between the licensees and Tulloch and was made the subject of repeated general discussions and consultations. Several of these consultations were subsequent to the receipt of the letter from Burgstresser about which Tulloch says that he said nothing to any other licensee. The con-

clusion is inescapable, that Tulloch on several occasions took up with the licensees the subject of air cell board and imposed prices on this concededly unpatented material. The conclusion also cannot be avoided that Tulloch's testimony on this subject to say the least was incorrect. In view of the importance of his general testimony and of his dominating position throughout these transactions, Tulloch's credibility has direct bearing upon the question whether the Commission erred in finding that evidence existed to support the order.

■■ These facts dispose of petitioners' contention that neither the patent-licensing plan nor anything done by petitioners had the tendency or effect of fixing the prices of unpatented materials or restraining competition in them. Petitioners urge in this connection that the uncontradicted evidence shows that there was competition in the unpatented materials which in fact resulted in undercutting the prices of the patented materials to such an extent that all of the petitioners except Carey cancelled their licenses a considerable period prior to the filing of the complaint. These circumstances, however, do not relieve the petitioners of liability for their acts, which constituted a violation of the Federal Trade Commission Act, § 5, Title 15 U.S.C. § 45(a), 15 U.S.C.A. § 45(a). It is the combination or conspiracy in restraint of trade or commerce which the Act prohibits "whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." Socony Vacuum Oil Co. v. United States, supra [310 U.S. 150, 60 S.Ct. 845]. The fact that the projects charged and proved never came to fruition is not material, for it is the object of the Federal Trade Commission Act to reach in their incipiency combinations which could lead to undesirable trade restraints. Fashion Originators' Guild v. Federal Trade Commission, supra, 312 U.S. at page 466, 61 S.Ct. 703, 85 L.Ed. 949. The conclusion that the habitual use of the established price list, of the uniform zones, classification of customers and other methods of stabilizing the industry lessened competition and fixed prices in unpatented as well as patented material is supported by the record.

■ It was not error for the Commission to issue the cease and desist order even though the licenses were cancelled by all but one of the petitioners prior to the institution of the action. The Commission is invested with a wide discretion in determining whether or not the practices forbidden will be resumed. Arkansas Wholesale Grocers' Ass'n v. Federal Trade Commission, 8 Cir., 18 F.2d 866, certiorari denied 275 U.S. 533, 48 S.Ct. 30, 72 L.Ed. 411; Vaughan v. John C. Winston Co., 10 Cir., 83 F.2d 370, 376.

■ The order as to petitioner Plant Rubber & Asbestos Works, however, must be reversed. The sole testimony implicating this petitioner, a California corporation, with the conspiracy is the fact that it was for some period a licensee, in which capacity presumably it received communications sent by Tulloch to all licensees. The record is devoid of any evidence of cooperation or combination in restraint of trade on the part of Plant Rubber & Asbestos Works. There is no evidence of sale by this petitioner of unpatented materials at licensed prices, nor of the slightest assistance toward securing the ends of the combination. Obviously evidence of being a licensee is not sufficient of itself alone to sustain a finding of conspiracy. As to all other petitioners and in all other respects the order of the Federal Trade Commission is affirmed.