**UNION CIRCULATION COMPANY, Inc., National Circulating Company, Inc., Periodical Sales Company, Inc., Publishers Continental Sales Corporation, Corporations,**

**and**

**Leo E. Light and Roy C. Hodge, Co-Partners, doing business as National Literary Association, Petitioners,**

**v.**

**The FEDERAL TRADE COMMISSION, Respondent.**

**No. 16, Docket 23588.**

United States Court of Appeals Second Circuit.

Argued Nov. 8, 1956.

Decided Feb. 18, 1957.

**654**

Gilbert H. Weil, New York City (Alfred T. Lee, New York City, on the brief; Mortimer M. Lerner, New York City, of counsel to National Circulating Co., Inc.), for petitioners.

Earl W. Kintner, Gen. Counsel, Robert B. Dawkins, Asst. Gen. Counsel, John Carter, Jr., Washington, D. C., Atty., Federal Trade Commission, for respondent.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

Petitioners are agencies engaged in the business of selling subscriptions for magazines and periodicals by door-to-door solicitation. They were charged with engaging in unfair methods of competition and unfair or deceptive acts or practices in violation of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a). At the conclusion of the administrative proceedings before the Federal Trade Commission that Commission issued a cease and desist order. Petitioners bring their petition to us seeking to review this order.

The door-to-door subscription solicitation business is conducted through crews of solicitors who travel from place to place throughout the country. A crew may have from a few to forty or more solicitors, together with a supervising crew manager. The petitioners, the agencies, contract directly with the crew manager, who in turn usually engages the solicitors and controls their work. The solicitors, the managers, and the petitioners are all paid on a commission basis determined by the number and nature of periodical subscriptions secured. The solicitors collect part or all of the subscription money. The proper amounts are remitted by the crew managers through the agencies to the publishers.

The Federal Trade Commission found that *door-to-door* solicitation of subscriptions to periodicals conducted in this manner accounts annually for millions of subscriptions valued at millions of dollars; that the petitioners are among the leaders in the field and constitute a very substantial segment of the industry; and that they contract for the services of 3,000 solicitors, who

procure $15,000,000 of such subscriptions annually.

The Trial Examiner found that for many years the reputation of the magazine-selling industry, both with the publishers and the general public, has been undermined by the deceptive selling practices and other fraudulent conduct of many of the solicitors in the field. Misrepresentation of magazine content, misappropriation of subscription monies, and false sympathy appeals are among the practices that plague this industry. The history of the petitioners and other subscription agencies over the past twenty years is a chronicle of attempts to curb these abuses by such devices as jointly sponsored "Standards of Practice," a Central Registry providing information about individual solicitors, and a trade association created to study new remedial techniques and to sponsor their industry-wide adoption.

In recent years the petitioners have entered into "no-switching" agreements with each other, typically providing that each agency will not hire any solicitors who have been employed by the other signatory agency at any time during a certain period, usually the preceding year. Petitioners have also agreed at various times not to hire solicitors who have been employed by *any other* agency, whether or not a party to the agreement. The petitioners contend that these agreements have been entered into solely in order to prevent the fraudulent practices of certain crew members, it being maintained that they are less likely to respond to agency discipline or to observe agency standards when they are able to move about freely from one agency to another; and, in particular, that such crew members, when their fraudulent practices are discovered by one agency, find it easy to obtain new employment with a less scrupulous agency.

From this testimony the hearing examiner concluded that the "no-switching" agreements represent a reasonable attempt at self-regulation by members of an industry and therefore the practice of entering into them should not be enjoined. The Commission rejected this conclusion, however, finding that the "no-switching" agreements were an unreasonable restraint of trade and constituted unfair methods of competition within the meaning of Section 5 of the Federal Trade Commission Act, 15 U. S.C.A. § 45(a).

The Commission also found that several of the petitioners had illegally attempted to coerce the publishers into withdrawing the authority to sell subscriptions from the Federal Readers Guild, an agency that was not a party to any "no-switching" agreement.

The Commission accordingly enjoined the petitioners from: " * * * 1. Entering into, carrying out, enforcing or giving effect to any agreement not to employ parties who have previously been actively engaged for themselves or for others in the business of soliciting magazine subscriptions.

"2. Ceasing or limiting, or threatening to cease or limit, their efforts to obtain subscriptions for magazines for publishers unless such publishers refuse or discontinue authority to solicit subscriptions for their magazines to subscription agencies employing sales representatives formerly connected with other subscription agencies."

The petitioners appeal from the order of the Commission, and seek to have both of its provisions set aside.

Substantial evidence was adduced at the hearings to support the second part of the order. The Commission found that several of the petitioners joined in a concerted effort to coerce the magazine publishers into withdrawing their authorizations from a newly formed competitor, the Federal Readers Guild. Several experienced crew managers, with their crews, had switched employment to the new competitor. At the Commission hearings the owner of Federal Readers testified without contradiction that he had attended a meeting with several representatives of the

petitioners at which petitioner Leo Light threatened to have all the publishers "cancel out" the Federal Readers Guild. Light indicated that a meeting would be held that evening to discuss ways and means to accomplish this. Although no evidence was introduced to show whether the meeting was ever held, there was evidence that several publishers subsequently canceled their authorizations with Federal Readers. Since the Commission could reasonably infer that the petitioners carried out their illegal scheme of coercion, the second part of its order enjoining such conduct in the future is clearly justified.

Of much greater significance are the "no-switching" agreements proscribed by the first part of the order. Petitioners readily admit the widespread existence of these agreements, but contend that they are not unfair methods of competition because they are directed only at the prevention of abuses within the industry and are not directed at the elimination or obstruction of competition.

■ A violation of the Sherman Act, 15 U.S.C.A. § 1 et seq., is an unfair method of competition under the Federal Trade Commission Act. F. T. C. v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307; Keasbey & Mattison Co. v. F. T. C., 6 Cir., 1947, 159 F.2d 940, 946. Under the Sherman Act the test of validity for any restraint of trade is not the motive of the parties who act in concert. Restraints of trade must be examined not merely for the intent of their creators but for their reasonableness, Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, and therefore they must be considered in the light of their impact upon the competitive structure of the industry affected.

■ Since the Standard Oil decision, many concerted restraints of trade have been held unlawful or unreasonable per se,[1] and "no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129. Many group boycotts or concerted refusals to deal, and certain other restraints such as price-fixing, market-sharing, or production control, are considered so inimical to competition that they will not be countenanced regardless of the portion of the industry that they actually affect or the alleged beneficial ends that they are designed to serve. See United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533; Fashion Originators' Guild of America v. F. T. C., 1941, 312 U.S. 457, 467–468, 668, 61 S.Ct. 703, 85 L. Ed. 949; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129; Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 210 F.2d 732, 740–741, certiorari denied, 1954, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645.

Although "some agreements and practices are invalid per se, * * * others are illegal only as applied to particular situations." United States v. E. I. Du Pont de Nemours & Co., 1956, 351 U. S. 377, 387, 76 S.Ct. 994, 1002, 100 L.Ed. 1264. When the courts or the Commission are confronted with an alleged boycott whose deleterious effect on competition is not as apparent on its face as that of the agreements which have been held illegal per se, they may consider its actual or potential impact upon the competitive fabric of the particular industry affected. Ruddy Brook Clothes v. British Foreign & Marine Ins. Co., 7 Cir., 195 F.2d 86, certiorari denied, 1952, 344 U.S. 816, 73 S.Ct. 10,

[1]. Judge Medina believes that we should avoid a discussion of the applicability of the per se doctrine, because, upon appeal, it was neither briefed nor argued by either side, and it is not necessary to discuss it in order to reach our result. He would prefer to leave per se applicability here an open question.

97 L.Ed. 635; United States v. Insurance Board of Cleveland, D.C.N.D. Ohio 1956, 144 F.Supp. 684. The restraints here under consideration, the "no-switching" agreements, are dissimilar in several significant respects to the group boycotts that have been held illegal *per se* by the Supreme Court. The "no-switching" agreements are directed at the regulation of hiring practices and the supervision of employee conduct, not at the control of manufacturing or merchandising practices.[2] These agreements are not designed to coerce retailers, or other independent members of an industry, into abandoning competitive practices of which the concerted parties do not approve. Rather, they are ostensibly directed at "housecleaning" within the ranks of the signatory organizations themselves. Because a harmful effect upon competition is not clearly apparent from the terms of these agreements, we believe them to be distinguishable from those boycotts that have been held illegal *per se*. See United States v. Insurance Board of Cleveland, supra, 144 F.Supp. at pages 696–698. We shall therefore consider their application within the specific framework of the ' magazine-selling industry and in the light of the fact that the signatory parties represent a very substantial segment of that industry.

 The petitioners contend that the Commission found actual injury to competition only in the Federal Readers episode, and that this was an isolated incident unrelated to the "no-switching" agreements. The validity of these contentions is not determinative of the issue at bar, because the agreements should be struck down if their reasonable tendency, as distinguished from actual past effect, is to injure or obstruct competition. Under the Federal Trade Commission Act, industry agreements and practices have been enjoined without an actual showing of injury to competition in order to extinguish monopolistic practices before injury occurs. See Fashion Originators' Guild of America v. F. T. C., 1941, 312 U. S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; F. T. C. v. Raladam Co., 1931, 283 U.S. 643, 647, 51 S.Ct. 587, 75 L.Ed. 1324.

2. The Supreme Court, in the long and active history of anti-trust litigation, has rarely considered the validity of agreements directed solely at the employment practices of an industry. Perhaps the closest parallel to the situation at bar was reviewed in Anderson v. Shipowners' Ass'n of Pacific Coast, 1926, 272 U.S. 359, 47 S.Ct. 125, 127, 71 L.Ed. 298. There it was alleged that the members of the respondent associations owned, operated or controlled substantially all the merchant vessels of American registry engaged in interstate and foreign commerce between the ports of the Pacific Coast and to and from foreign countries. The associations required every seaman seeking employment to register with them, receive a number, and await his turn before he could obtain employment. A certificate was issued to each seaman reciting in part that no person would be employed unless registered, that the certificate must be delivered to the master of the vessel, and that the certificate was the personal record of the seaman and the basis of his future employment. The shipowners, as members of the associations, were bound to hire in accordance with the terms of the certificates. In addition, the associations fixed the wages to be paid the seamen.

The Supreme Court, reversing the district court and the court of appeals, held that the shipowners, if these alleged facts were so, by jointly surrendering their "freedom of action in the matter of employing seamen," had unlawfully restrained trade in violation of section 1 of the Sherman Act. The decision does not indicate whether this restraint would be invalid *per se* or whether it would be found unreasonable under the particular circumstances of the industry, the Court saying only that "each of the shipowners and operators, by entering into this combination, has, in respect to the employment of seamen, surrendered himself completely to the control of the associations." Anderson v. Shipowners Ass'n of Pacific Coast, 1926, 272 U.S. 359, 362, 47 S. Ct. 125, 126, 71 L.Ed. 298. Furthermore, since the appeal was from a dismissal of the complaint for failure to state a cause of action, the Court was not required to consider evidence in justification of the rules of the associations.

Because the hearing examiner in this case concluded that these agreements were not illegal *per se,* he properly admitted evidence tending to show the circumstances prompting their formulation and adoption and the allegedly beneficial effects that they have upon the industry. But in order to decide whether these restraints are reasonable, we must also consider their actual or potential impact upon the competitive structure of the magazine-selling industry. Here it appears that the reasonably foreseeable effect of the "no-switching" agreements will be to impair or diminish competition between existing subscription agencies, and to prevent would-be competitors from engaging in similar activity. One probable result of the agreements, because entered into by organizations that represent a very substantial segment of the industry, will be to "freeze" the labor supply, which is the indispensable element of the door-to-door magazine-selling trade. Although only the signatory agencies are bound by the agreements, a crew member working for one of them will hesitate to leave his employer in order to join a newly formed competitor, or an expanding established one, if he knows that he may be out of work for a year in the event that the latter agency does not prove to be successful. The tendency of the "no-switching" agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well-established signatory agencies and to the disadvantage of infant organizations.

Thus we find the "no-switching" agreements, in the context of the industry affected, to be harmful to competition, and therefore an unreasonable restraint of trade within the meaning of the Sherman Act, and the proper subject of injunction by the Federal Trade Commission.

One last contention of the petitioners remains to be considered. They claim that the agreements were intended to affect only those crew members who have a record of deceptive selling practices and other fraudulent conduct, and, in practice, that they have been invoked only against such crew members. Whether or not this be true, the agreements considered by the Federal Trade Commission are capable of enforcement against any crew member. The petitioners can not be left to police the magazine-selling industry by a method as ripe for abuse as that offered by such agreements.

The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices. Therefore dicta in cases cited by the petitioners from such decisions as Butterick Publishing Co. v. F. T. C., 2 Cir., 1936, 85 F.2d 522, Fashion Originators' Guild of America v. F. T. C., 2 Cir., 1940, 114 F.2d 80, affirmed, 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949, and Ruddy Brook Clothes v. British Foreign & Marine Ins. Co., 7 Cir., 195 F.2d 86, certiorari denied, 1952, 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635, are no guide to us here and we need not pass on the questions raised by those cases.

The petitioners asked the Commission to modify its original order so as to permit the application of the "no-switching" agreements to solicitors "who in the course of such business have been using unfair methods of competition, or unfair or deceptive acts or practices." The Commission properly refused this request, pointing out that the application and effects of an agreement so restricted had not been explored by it, and thus there was no evidence in the record by which the reasonableness of such a hypothetical agreement could be tested.

For the reasons expressed above, the "no-switching" agreements do not survive the close scrutiny that must be given under Section 5 of the Federal Trade Commission Act to any concerted restraints of trade. Therefore the order of the Commission must be affirmed in all respects.

Order affirmed.