THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JOSEPH MASIELLO, Individually and as President of Newsdealers Federal Labor Union, Local No. 22,371, and Others, Defendants.

Supreme Court, Special Term, New York County, December 2, 1941.

*John J. Bennett, Jr. Attorney-General* [*Benjamin Heffner* and *Martin J. McLaughlin, Assistant Attorneys-General,* of counsel], for the plaintiff.

*Joseph Bleich*, for the defendants.

*Liebman, Leider & Witt,* for the Greater New York Industrial Union Council, *amicus curiæ.*

*George Natanson* [*Abraham J. Isserman,* of the New Jersey Bar, of counsel], for the Newspaper Guild of New York.

KOCH, J.  This is a motion by the Attorney-General of the State of New York for a temporary injunction restraining the defendants, members of Newsdealers Federal Labor Union, Local No. 22,371, (1) from picketing the places of business of newsdealers engaged in the sale of the *World-Telegram,* the *Journal-American,* the *New York Times,* the *Daily Mirror,* the *Sun,* the *Herald-Tribune* and the *Daily News;* (2) from coercing the newsdealers to refrain from purchasing said newspapers; (3) from distributing circulars repre-

senting that the defendants are engaged in a labor dispute; (4) from all acts tending to boycott any newsdealers purchasing or reselling said newspapers; and (5) from otherwise combining and acting in concert to impair, prevent and destroy free competition in the sale and distribution of newspapers.

The action is brought by the People of the State of New York against the members of the union above referred to, pursuant to article 22 of the General Business Law (the Donnelly Act). Section 340 of said statute makes illegal and void any contract, agreement, arrangement or combination which actually creates, or may do so, a monopoly as to any commodity of common use, or which restrains or may restrain free competition as to such articles or commodities. Section 342 of the statute authorizes the Attorney-General to bring an action to enjoin the doing of any act in aid of the contracts, agreements or combinations declared void by section 340.

The defendants contend that the controversy between themselves and the seven newspapers above named constitutes a " labor dispute " within the meaning of section 876-a of the Civil Practice Act, and that, therefore, no injunction may be issued unless that section is complied with. Concededly the complaint is drawn on the theory that no such labor dispute exists, and the Attorney-General has made no effort to meet the requirements of section 876-a. If that section is held to apply here, it is clear that the motion for a temporary injunction must be denied.

Concededly none of the defendants, and none of the newsdealers who are not defendants in this action, are employees of any of the seven newspapers previously mentioned. All the newsdealers are retail merchants who purchase newspapers and resell them at a profit. They receive no stipulated wages and they are free to fix their own hours of labor. The various restrictions imposed by the newspapers upon activities of newsdealers do not have the effect of making the newsdealers employees of the newspapers rather than independent contractors. It is not at all uncommon for vendors of merchandise to place limitations upon the business methods of those who purchase from them. The newsdealers purchase and resell newspapers published not only by the seven newspapers heretofore mentioned, but also various other newspapers. Most of them purchase and resell in addition magazines and other literature, and many if not most of them also deal in various other products, such as cigarettes, candy, stationery, toys, etc.

It follows that the controversy between the seven newspapers and the newsdealers is one between vendors and vendees, involving no employer-employee relationship. Under the circumstances there is no " labor dispute " as that term is defined in paragraph (c) of

subdivision 10 of section 876-a of the Civil Practice Act. Although it is not necessary that the particular disputants in a specific controversy stand in the relation of employer and employee (see Civ. Prac. Act, § 876-a, subd. 10, ¶ c), the dispute must be one concerning "terms or conditions of employment * * * or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee." This section does not apply to differences where as here no employment relationship whatsoever is involved.

In *Bailiss* v. *Fuchs* (283 N. Y. 133) the Court of Appeals in an opinion by Judge Sears said (p. 137): "Thus, it is clear that the first essential for a ' labor dispute ' is employment. In *Thompson* v. *Boekhout* (273 N. Y. 390), where the proprietor of a small picture theatre employing only one man discharged his single employee before a strike was called, there was no employment existing at the time of the strike, hence no ' labor dispute.' "

The recent case of *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.* (311 U. S. 91), cited in the brief submitted by the newspaper guild as *amicus curiæ*, is clearly distinguishable. In that case the four plaintiffs consisted of a C. I. O. Union of miscellaneous dairy workers, of two Chicago dairies whose milk was processed and distributed by members of that union, and of a Wisconsin co-operative association which supplied the milk to the plaintiff dairies. The defendants were the Chicago local of the A. F. of L. Milk Wagon Drivers' Union, and its officials. The defendants claimed that many of their members had lost employment as milk wagon drivers because of a system which has grown up under which plaintiff dairies, instead of delivering milk through drivers employed by them, sold their milk to individuals owning their own trucks, who in turn resold the milk to retail stores. These stores made a practice of selling milk below the standard prices charged for milk supplied by dairies employing A. F. of L. drivers. Defendant union and its members claimed that the reason the price could be cut was that the vendors worked long hours under unfavorable working conditions, without vacations and with very low earnings. To combat the "vendor system," and to unionize the employees of the dairies utilizing the system, the defendants began to picket the so-called cut-rate stores. The United States Supreme Court held that the case was a labor dispute within the meaning of the Norris-LaGuardia Act. It is important, however, to note that the defendants consisted of a union of true employees, and not of retail dealers such as the newsdealers in the instant case. That they were attempting to unionize plaintiff dairies and to put an end to the "vendor system" did not affect the fact that the con-

troversy was one relating to conditions of employment, and the circumstance that the employees of plaintiff dairies were already organized " merely transformed the defendants' activities from an effort to organize non-union men to a conflict which included a controversy between two unions " (p. 99). Furthermore the court pointed out (p. 98) that " plaintiffs' evidence showed that the ' vendors ' were actually regarded as employees of the plaintiff dairies."

The defendants also rely heavily upon the very recent decision of the United States Circuit Court of Appeals of the Ninth Circuit in *Hinton* v. *Columbia River Packers Association* (117 F. [2d] 310). In that case the dispute was between an association of packers and a union of persons engaged in fishing who sold their catch to the packers' association. The holding that a " labor dispute " within the meaning of the Norris-LaGuardia Act was involved was based upon the court's belief that *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products* (*supra*) was controlling. The court said (p. 313): " There, as here, the controversy was between what we call ' employers ' on one side, and independent contractors on the other side." With this interpretation of the decision of the United States Supreme Court this court is unable to agree. The controversy in *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products* (*supra*) was not between employers and independent contractors, but between employers and a union of A. F. of L. employees, and for the reasons heretofore indicated it would seem that the decision in said case should not have been deemed controlling. As an additional reason for its holding the Circuit Court of Appeals stated that the word " employment " in the phrase " terms or conditions of employment " employed in the Norris-LaGuardia Act was broad enough to include within its scope the activities of the fishermen who sold fish caught by them to the packers association. In the opinion of this court such a broad interpretation of the word " employment " is not warranted by the language of section 876-a of our Civil Practice Act. It puts a strained and unnatural meaning upon the word " employment " which appears to be unjustified by the context or by the spirit and purpose of the statute. Were this interpretation to be adopted, all disputes between wholesalers or manufacturers on the one hand and retail merchants, regardless of the sizes of their business, on the other, would constitute " labor disputes " within the meaning of section 876-a of the Civil Practice Act.

The case of *Newark Morning Ledger Co.* v. *Suburban Newsdealers' Association of the Oranges* (9 N. J. Misc. 373; 154 A. 534), cited by counsel for the Newspaper Guild of New York, is not

in point. No question of the violation of a statute such as the Donnelly Act of our State was there involved. The case of *Suchodolski* v. *American Federation of Labor* (127 N. J. Eq. 511; 14 A. [2d] 51) likewise has no application to the case at bar. A union of window cleaners was there enjoined from picketing a customer of a competing non-union window cleaner to induce the customer to engage a union member in his stead. The language quoted in the brief submitted by counsel for the Newspaper Guild, when read in its context, is clearly of no pertinency here.

The contention that a " labor dispute " as defined in section 876-a of the Civil Practice Act exists here is accordingly overruled.

The defendants also claim that they are a " *bona fide* labor union " within the meaning of section 340 of the General Business Law, and that they are, therefore, entitled to the express exemption from the provisions of the Donnelly Act granted in that section to " *bona fide* labor unions." For reasons similar to those upon which this court has predicated its holding that no " labor dispute " is involved here, the argument that defendants constitute a " *bona fide* labor union " must be rejected as unsound. The defendants are a trade association of retail merchants and not a *bona fide* labor union within any reasonable interpretation of that term.

The fact that many if not most of the defendants have small businesses cannot justify any differentiation between them and retail merchants conducting large businesses. The Donnelly Act is equally applicable to all persons and firms, whether large or small, who violates its provisions except *bona fide* labor unions and co-operative associations of farmers, gardeners or dairymen.

It is further maintained that the seven newspapers against which the defendants' activities are directed are themselves guilty of violations of the Donnelly Act in that they act in concert to fix prices and prevent free and unrestrained competition. Assuming these charges to be justified, they furnish no defense to the present action. It is important to keep in mind that this action is brought by the Attorney-General of the State solely for the benefit of the general public to the end that members of the public may have the advantage of free and unrestrained competition in the sale and distribution of newspapers. The fact that the granting of the present application or plaintiffs' ultimate success in the action may incidentally benefit the seven newspapers above referred to is beside the point and furnishes no ground for defeating the present action. If the newspapers are guilty of violating the Donnelly Act the Attorney-General should also proceed against them. An affidavit submitted on behalf of the Attorney-General states that

his office has been and always is willing to hear complaints against any one engaged in restraint of trade. To permit the newsdealers to violate the Donnelly Act in reprisal for transgressions of that act by the newspapers, or to allow the newsdealers to use such transgressions as a defense in an attempt to put an end to their own violations of the act would, to use the vernacular, leave the public "holding the bag." Public interest demands that all concerted action in restraint of free competition be enjoined regardless of whether such acts are committed by both newspapers and newsdealers or by only one or the other.

We pass next to the point made by the defendants that their picketing and other activities are included within the constitutional guaranty of freedom of speech. They rely principally upon such cases as *Thornhill* v. *Alabama* (310 U. S. 88); *New Negro Alliance* v. *Sanitary Grocery Co.* (303 id. 552), and *Julie Baking Co., Inc.,* v. *Graymond* (152 Misc. 846). They maintain that the right of picketing is not confined to labor disputes. It is unnecessary at this time to make any attempt to define with precision the limits within which the right to picket is protected by the constitutional guaranty of freedom of speech. It is sufficient to point out that it has been repeatedly held that picketing may be enjoined when accompanied by violence and disorder (see, for example, *Busch Jewelry Co.* v. *United Retail Employees' Union,* 281 N. Y. 150), and that even in *Thornhill* v. *Alabama* (*supra*) the United States Supreme Court said (p. 105): "We are not now concerned with picketing *en masse* or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger."

That case involved a labor dispute and the holding was merely (p. 102) that "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Consitution."

In *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.* (312 U. S. 287), Mr. Justice FRANKFURTER, writing for the court, indicated that the various States "are free to shape their local policy" in respect of the granting of injunctions against picketing in cases "warranting restraint upon normally free conduct" (p. 296).

A similar observation was made in *Carlson* v. *California* (310 U. S. 106, 113): "The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted."

The right to picket is subject to restrictions and limitations even if exercised peacefully and without producing disorder or violence. Even peaceful picketing may not be resorted to for the purpose of aiding and furthering a conspiracy to restrain trade in violation of a penal statute such as the Donnelly Act. What is lawful when done by persons individually may become unlawful when it is the result of concert and combination to achieve an illegal result. The constitutional guaranty of freedom of speech does not avail the defendants in the instant case if, as charged, their activities are part of a conspiracy or concerted arrangement to violate the Donnelly Act.

We proceed now to the question of whether the evidence establishes that the defendants have been guilty of acts and conduct proscribed by the Donnelly Act. There is little or no evidence to substantiate the claim of the Attorney-General that the defendants combined " to create, establish and maintain a monopoly " in the business of selling daily newspapers at retail, and to impair, prevent and destroy in New York city the free pursuit of that lawful trade, business or occupation. (Complaint, ¶ 13.)

The defendants consist of between 500 and 1,000 of the 14,000 newsdealers engaged in business in the city of New York. It is clear from the evidence that the ultimate object of the acts and conduct on their part complained of by the plaintiffs is to induce the seven newspapers heretofore mentioned to grant the defendants and newsdealers generally better terms. The defendants do not appear to have combined for the purpose of eliminating the competition of the other 13,000 odd newsdealers and obtaining a monopoly of newspaper distribution for themselves.

On the other hand, there is abundant evidence that the defendants by concerted action are boycotting the seven newspapers aforesaid and are attempting by picketing, distribution of circulars and in some instances perhaps by threats and intimidation, to induce other newsdealers to refrain from purchasing or reselling the seven newspapers and to sell only the *New York Post*. The natural and inevitable tendency of what the defendants are doing is to reduce substantially the sales of newspapers other than the *New York Post*, and if sufficiently successful, to leave the *New York Post* as the only newspaper in the New York city newspaper field. Such activities violate the Donnelly Act which forbids every combination whereby " competition or the free exercise of any activity in this State in the manufacture, production, transportation, marketing or sale in this State * * * of any " article or commodity of common use " is or may be restrained or prevented." (Gen. Bus. Law, § 340, subd. 1, ¶ 2.) Similar boycotting activities were held

illegal in *Paramount Pictures* v. *United Motion Pictures Theatre Owners* (93 F. [2d] 714) as violating the Sherman Anti-Trust Act, whose provisions are similar to those of the Donnelly Act. (*New York Clothing Mfrs. Exchange, Inc.*, v. *Textile Finishers Assn., Inc.*, 238 App. Div. 444, 452.)

The fact that the owners and operators of independent motion picture houses whose activities were held illegal in *Paramount Pictures* v. *United Motion Picture Theatre Owners* (*supra*) were probably better off financially than the newsdealers to whom this action relates furnishes no valid basis of differentiation. A combination may be invalid as tending to restrain free and unrestricted competition even if it makes no attempt to fix or regulate prices or to parcel out or limit production or to bring about deterioration in quality. "Action falling into these three categories does not exhaust the types of conduct banned by the Sherman and Clayton Acts." (*Fashion Originators' Guild* v. *Federal Trade Commission*, 312 U. S. 457, 466.)

Nor is it necessary in order to make out a case of violation of the Donnelly Act that the defendants shall already have succeeded in producing a monopoly. " It is sufficient if it [the conduct of the defendants] really tends to that end and to deprive the public of the advantages which flow from free competition." (*Fashion Originators' Guild* v. *Federal Trade Commission, supra*, p. 466.)

Nor may defendants justify their attempt to boycott the sale of newspapers other than the *New York Post* on the ground that their only aim is to improve the economic conditions under which they operate. In *Fashion Originators' Guild* v. *Federal Trade Commission* (*supra*) it was held that even the laudable purpose of preventing piracy of dress designs did not justify (p. 467) the intentional destruction of one type of manufacture and sale which competed with guild members. The court said (pp. 467, 468) that " the purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts." It added, " Nor can the unlawful combination be justified upon the argument that systematic copying of dress designs is itself tortious or should now be declared so by us. * * * Even if copying were an acknowledged tort under the law of every State, that situation would not justify competitors in combining together to regulate and restrain interstate commerce in violation of Federal law."

The cases of *Appalachian Coals, Inc.*, v. *United States* (288 U. S. 344 [cited by defendants here]) and *Sugar Institute* v. *United States* (297 id. 553) were distinguished by the United States Supreme

Court in *Fashion Originators' Guild* v. *Federal Trade Commission* (*supra*), on the ground that they involved no attempt to eliminate competition of others. The case of *New York Clothing Mfrs. Exchange, Inc.*, v. *Textile Finishers Assn., Inc.* (*supra*), is also distinguishable on the same ground.

The question whether the equities as between the seven newspapers and the newsdealers are in favor of the latter is wholly irrelevant for the purpose of determining the present application. Nor may the court consider whether the newsdealers are deserving of sympathy. The only consideration properly before the court is whether it is to the interest of the general public — not of the newsdealers or the newspapers — to permit the defendants to engage in conduct tending to eliminate from New York city newspaper field all newspapers other than the *New York Post*, and perhaps one or two others.

There remains for consideration the question whether sufficient has been shown to warrant the granting of injunctive relief.

In *People ex rel. Bennett* v. *Laman* (277 N. Y. 368) our Court of Appeals in an opinion by Crane, Ch. J., declared (p. 376) " That a court of equity will not undertake the enforcement of the criminal law, and will not enjoin the commission of a crime," except in case of damage, actual or threatened, to property or rights of a pecuniary nature (p. 378). In the concluding portion of the opinion it is stated that (p. 384) " In the case at bar the People would not be entitled to an injunction upon a mere showing that the statute had been violated or that acts prohibited by the statute had been performed, *in the absence of special statutory authority*." (Italics supplied.)

Section 342 of the General Business Law specifically appears to contain the " special statutory authority " referred to in the last quotation, for it expressly authorizes the Attorney-General to bring an action to restrain any act declared to be illegal by section 340 without containing any requirement that there be a showing of actual damage to the public.

The motion for a temporary injunction is accordingly granted. Settle order.