## UNITED STATES v. MORGAN et al.

### Civ. No. 43–757.

United States District Court,
S. D. New York.

April 9, 1951.

Irving H. Saypol, U. S. Atty., New York City, Roscoe T. Steffen, Henry V. Stebbins, Walter K. Bennett, Edgar A. Buttle, Mervin C. Pollak, Harry G. Sklarsky, Francis E. Dugan and Margaret H. Brass, Sp. Assts. to Atty. Gen., for plaintiff, Daniel Reich, Julius E. Yokel, New York, City, Robert W. Walter, Port Washington, N. Y., and Herman G. Gelfand, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendant Eastman, Dillon & Co., Herman A. Heydt, Jr., New York City, of counsel.

Cahill, Gordon, Zachry & Reindel, New York City, for defendants Dillon, Read & Co., Inc. and Stone & Webster Securities

Corp., Mathias F. Correa and R. Graham Heiner, New York City, of counsel.

Cleary, Gottlieb, Friendly & Cox, New York City, for defendant Investment Bankers Ass'n of America, Hugh Cox and Fowler Hamilton, New York City, of counsel.

Covington & Burling, Washington, D. C., for defendant Smith, Barney & Co., W. Graham Claytor, Jr., and William Stanley, Jr., Washington, D. C., of counsel.

Cravath, Swaine & Moore, New York City, for defendants Kuhn, Loeb & Co., and Union Securities Corp., William Dwight Whitney and George Stephen Leonard, New York City, of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendants Morgan Stanley & Co. and Harriman Ripley & Co., Inc., John W. Davis, Ralph M. Carson and Edward R. Wardwell, New York City, of counsel.

Donovan, Leisure, Newton, Lumbard & Irvine, New York City, for defendant Harris, Hall & Co. (Inc.), Douglas V. Lewis, Roy W. McDonald and John J. O'Connell, Jr., New York City, of counsel.

Drinker, Biddle & Reath, Philadelphia, Pa., and Emmet, Marvin & Martin, New York City, for defendant Drexel & Co., Henry S. Drinker and John G. Williams, Philadelphia, Pa., of counsel.

Shearman & Sterling & Wright, New York City, for defendant White, Weld & Co., Walter K. Earle and Lauretta D. Robinson, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Blyth & Co., Inc., Glore, Forgan & Co., Goldman, Sachs & Co. and Lehman Bros., Arthur H. Dean, William Piel, Jr. and Roy H. Steyer, New York City, of counsel.

Sullivan & Cromwell, New York City, and Choate, Hall & Stewart, Boston, Mass., for defendant First Boston Corp., Arthur H. Dean, William Piel, Jr., Roy H. Steyer, New York City, Robert Proctor and Charles F. Choate, Boston, Mass., of counsel.

Webster, Sheffield & Horan, New York City, for defendant Kidder, Peabody & Co., Bethuel M. Webster, Edward L. Rea and Bancroft G. Davis, New York City, of counsel.

## PRE-TRIAL ORDER NO. 3

The undersigned having been designated by order of Honorable John C. Knox, now the Chief Judge but then Senior District Judge of this Court, dated the 13th day of February, 1948, to hear all motions and other matters preliminary to trial, to conduct all pre-trial procedure and to act as presiding judge at the trial of the cause; and Pre-Trial Orders Nos. 1 and 2 having been made and filed respectively on June 10, 1948 and May 25, 1950, D.C., 10 F.R.D. 240; and various further proceedings having been had as is more fully set forth in the subjoined memorandum, which is hereby made a part of this order;

It is ordered

*A. General Pre-Trial Provisions*

A(1) Amendments of complaint:

(a) On March 28, 1951, plaintiff's motion to delete paragraphs 44 E (2) and 45 A (11) was granted. Accordingly, no evidence will be received in support of the allegations thus withdrawn.

(b) The application made during the Pre-Trial Conferences of April 3, 4, 5, 6 and 9, 1951, to eliminate from the case the material described in III (B) (1) (f) "Organized Opposition to California Railroad Commission Rule", V (B) "Promotion of Consolidations and Mergers for the Purpose of Creating New Companies Whose Financing Defendants Can Control", as contained in the Table of Contents of the Trial Brief for the United States Part I, described as Summary and Analysis of Facts, is granted. No evidence will be received relative to such matters.

(c) Approval is hereby given of the curtailment of proof in support of II (B) (3) "Application of Historical Position Doctrine to Issues Offered at Competitive Bidding", III (B) (3) (a) "Organization of Overly Large Syndicates", III (B) (3) (d) "Creation of Stand-by Accounts", V (A) (4) "Utilization of their Influence with Commercial Banks with Whom Issuers Do Business" and V (A) (5) (b) "Reorganization of Missouri Pacific Railway Com-

pany" as set forth in the aforesaid Table of Contents of the Trial Brief for the United States.

(d) Plaintiff's motion to further amend the complaint is granted, without opposition, and paragraphs 22 J, 43, 44 A (2), 45 A (1) and 45 A (4) are hereby amended to read as follows:

Paragraph 22 J

J. *"Investment banker".*—A corporation, firm, or person engaged in the securities business who performs primarily the service of (1) rendering advice to issuers concerning financial and business matters, and (2) the purely merchandising function of purchasing security issues from issuers and selling them to security dealers and to investors.

Paragraph 43

43. Beginning in or about the year 1915 and continuing thereafter up to and including the date of the filing of this complaint, the defendants named herein, have engaged knowingly and continuously, in a wrongful and unlawful conspiracy to restrain unreasonably and to monopolize the securities business of the United States, by restricting, controlling, and fixing the channels and methods through which and the prices, terms, and conditions, upon which security issues are merchandised, and have, in fact, unreasonably restrained the securities business hereinbefore described, and have monopolized the merchandising of security issues therein by the negotiated underwritten method, all in restraint and in monopolization of the interstate commerce described in this complaint, in violation of Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies", as amended, commonly known as the Sherman Act (15 U. S.C.A. §§ 1 and 2). Defendants threaten to continue such offenses and will continue them unless the relief hereinafter prayed for in this complaint is granted.

Paragraph 44 A (2)

44 A (2) By recognizing and deferring to the claims of the defendant traditional bankers to manage and co-manage and control the merchandising of the securities of particular issuers.

Paragraph 45 A (1)

45 A (1) Whenever an issuer agrees to permit one of the defendant banking firms to manage the merchandising of a security issue, the other defendant banking firms recognize this as establishing a continuing banker-client relationship and recognize such firm as the traditional banker for the issuer, exclusively entitled to act thereafter for the issuer in merchandising its future security issues. A defendant traditional banker's recognized exclusive relationships in this respect continue indefinitely and, upon dissolution or reorganization of an investment banking firm acting as traditional banker, the other defendant banking firms agree as to which defendant banking firm or firms, if any, they will thereafter recognize as the successor or successors to the previously recognized relationships of such firm as traditional banker. When one of the defendant banking firms is the traditional banker for an issuer, none of the other defendants will discuss or undertake the merchandising of new security issues for that issuer. Defendant banking firms observe an ethic not to compete and refuse to "poach on each other's preserves."

Paragraph 45 A (4)

45 A (4) Defendant banking firms claim and accord to each other a continuing right to participate in the merchandising of all of the security issues of a particular issuer by respectively demanding and receiving from each other recognition of their historical position with respect to such issues. Once a defendant banking firm has been selected as an underwriter in a buying group formed to merchandise a security issue, it is recognized by the other defendant banking firms as having certain proprietary rights or historical position and is granted an opportunity to participate in every buying group thereafter formed to merchandise future security issues of the same issuer, and the extent of the participation and group position offered to such firm is usually the same. The historical position of an investment banking firm devolves through "inheritance" upon

the defendant banking firm or firms agreed upon by defendants as successor or successors of such firm.

The answers of each defendant are deemed to be amended so as to contain denials of each and every one of the allegations contained in the paragraphs of the complaint amended as aforesaid.

A(2) With reference to the failure of plaintiff to comply with paragraph (8) of Pre-Trial Order No. 2 requiring the submission of "a list describing by number all documents which plaintiff intends to offer in support of its affirmative case on the merits and arranging such document numbers in an organized manner in accordance with plaintiff's theory of its case":

(a) Documents to which no reference is made, directly or indirectly, in either plaintiff's "Notice and Memorandum Listing Documents to be Offered in Support of Plaintiff's Affirmative Case" or in plaintiff's "Notice and Supplemental Memorandum Listing Documents to be Offered in Support of Plaintiff's Affirmative Case": Plaintiff shall submit to the Court not later than 4:30 P.M. on April 23, 1951, a list of not more than fifty (50) such documents, appropriately identified, together with a schedule indicating the arrangement of such documents pursuant to the arrangement contained in the aforesaid Notice and Memorandum and Notice and Supplemental Memorandum, together with such brief or other statement as may be desired explaining the importance of such documents and any explanation for the failure to include them in the lists and arrangement already furnished. Counsel for the respective defendants may submit briefs or other statements relative to the said fifty (50) documents on or before 4:30 P.M. on April 25, 1951; and the Court will determine whether the said fifty (50) documents or any of them may be deemed to be added, *nunc pro tunc* as of the date of original filing of said Notice and Memorandum and Notice and Supplemental Memorandum. Permission is now given for the filing of the said Notice and Supplemental Memorandum as though application for leave to file the same had been timely made.

(b) Documents said to number approximately eight hundred (800) with respect to which the Notice and Memorandum, heretofore referred to and dated September 15, 1950, described only by a general statement that they were exhibits incident to the depositions already taken and without any further identification or arrangement "in an organized manner in accordance with plaintiff's theory of its case":

An order to show cause is to be promptly submitted bringing on for determination a motion by plaintiff for leave to include all or some of said approximately eight hundred (800) documents in "the list describing by number all documents which plaintiff intends to offer in support of its affirmative case on the merits and arranging such document numbers in an organized manner in accordance with plaintiff's theory of its case"; such order to show cause together with any briefs or memoranda shall be served on counsel for the respective defendants not later than April 16, 1951 and any briefs, memoranda or other papers to be submitted in opposition are to be served and filed not later than April 23, 1951; this motion together with the application relative to the list of not more than fifty (50) documents referred to in (a) above will be determined on the papers submitted and without oral argument.

A(3) No proffer of documentary evidence made as part of plaintiff's case-in-chief, of any document not contained in the lists already submitted and in the further list to be prepared by the Court in connection with the determination of the applications referred to in paragraph A(2) of this order, will be entertained by the Court unless on motion in writing and without oral argument an order has been previously made authorizing such proffer of further and additional documentary evidence.

A(4) On or before the opening of Court on April 30, 1951 the parties or such of them as may desire to do so, shall file briefs relative to the admissibility on the trial herein of testimony previously given before some Committee of Congress or other public body or otherwise so arranged

as to separately cover the case where such testimony was given:

(a) Pursuant to subpoena; (b) Pursuant to invitation issued by such Committee of Congress or other public body; and (c) Where such testimony was under varying circumstances that of a mere volunteer testifying as an individual or as a representative of some firm.

A(5) The various pre-trial disclosures and the opening statements of counsel having indicated to the Court that abundant evidence that the transactions involved in this case were in and affect interstate commerce, quite sufficient to sustain the jurisdiction of the Court herein, will be received in the course of the attempt by plaintiff to establish its case against the various defendant firms, no proofs separately offered to sustain the allegations contained in paragraphs 37, 38, 39, 40, 41 and 42 of the Complaint will be received except on motion for leave to introduce such proof just prior to the resting of its case by plaintiff.

A(6) In the event of a determination upon the merits in favor of plaintiff, then, after the Court has filed its opinion and settled findings of fact, all parties, including plaintiff, shall be afforded opportunity to present additional documentary and oral evidence relevant to whatever decree may be proposed in the light of such findings.

A(7) *Trial Date*: The taking of evidence shall begin, without further preliminary statements by counsel, at 10:40 A.M. on April 30, 1951, and continue from day to day, subject to the further orders of the Court.

B. *Pre-trial Provisions Relative to the Taking of Proof*

B(1) Proof, documentary and otherwise, which is admissible against some or all of defendants only in the event that a prima facie showing is made of combination, agreement or conspiracy in accordance with the requirements of controlling precedents, will be received subject to connection and motion to strike, upon condition that at the close of plaintiff's case and prior to the making of motions to dismiss and argument thereon counsel for plaintiff shall state to the Court in detail and with appropriate references to testimony and exhibits: (a) the proofs which it is claimed make out a prima facie case of such combination, agreement or conspiracy against all or some of defendants "aliunde", that is to say independently of the items received as above stated subject to connection and motion to strike; and (b) such further discussion of the evidence as a whole as will fully disclose the theory of plaintiff's case and the contentions made relative to what it is claimed has been established prima facie against each defendant. Because of the complicated nature of the case this is deemed essential in the interests of justice as a preliminary to the making of motions to dismiss and argument thereon.

B(2) In the interests of justice and to avoid unnecessary discussion and delay, counsel for the respective parties, during the entire trial, shall conform to the following rules:

(a) In connection with the submission of any documentary evidence: the party offering the document shall state the purpose or purposes for which the document is offered, the respective parties shall then each be afforded a reasonable opportunity to discuss orally with the Court the contents of such document, indicating the portion relied upon and presenting views as to the significance and interpretation thereof.

(b) Where letters, teletype messages or other documents constitute an identifiable group in chronological sequence they are to be offered as a group and not piecemeal; and where some portion thereof is relevant to a subject matter to be presented later on reference may then be made to the whole or such portions of such documents as may be desired, supplemented by a brief discussion of the significance and interpretation of the portion then relied upon.

(c) In connection with the offer by any party of a document or group of documents, counsel for any adversary party may briefly state matters of factual dispute to be later relied upon and proved together with a brief enumeration and identification of documents to be later relied upon in the same subject matter, whether or not such

documents have been previously authenticated during the pre-trial procedure herein (the authentication of documents to be offered by the various defendant firms as matter of defense not having as yet been undertaken). The omission to make any such statement or enumeration shall constitute no admission of any sort nor shall the failure of counsel offering the document or group of documents to object to said statement or enumeration constitute any admission that the facts stated or the documents enumerated are relevant or admissible in evidence. The opportunity to make such statement and enumeration is afforded to counsel solely because of the complexity of the case and, if abused, will be promptly withdrawn.

(d) Objections to questions or other offers of proof, motions and applications of every description made during the trial by counsel for a defendant or group of defendants shall be deemed to be made on behalf of each and every other defendant, except where express disclaimer is made, and each and every such defendant shall be deemed to have placed upon the record his exception to every adverse ruling on such objections, motions or other applications.

(e) Objections to evidence, testimonial and documentary, shall be made with the utmost brevity and without repetition. The Court will at all reasonable hours be available in chambers to facilitate the adoption of time-saving formulas for such objections.

(f) Exhibits shall be marked as follows:

(i) Those received generally against all defendant firms, by the symbol 1–A and so on, followed by the printed pre-trial number. For example: Exhibit 1–A (477).

(ii) Those received subject to connection and motion to strike, by the symbol 2–B and so on, followed by the initials of the defendant firm or firms (if any) against whom the exhibit is received generally and by the printed pre-trial number. For example: Exhibit 2–B (M S & Co.) (1522).

(iii) Each of the defendants' exhibits shall be marked with the initials of the defendant firm offering the exhibit, followed by a number in sequence, so that there shall be consecutive numbers for each defendant, and followed by the printed pre-trial number if any. For example: Exhibit KL–1 (5843).

(iv) Where several documents constituting a group are offered together, as provided in paragraph B(2) (b) of this order, each document shall receive a separate exhibit number.

B(3) The series of underwriting agreements heretofore duly authenticated by the parties and numbering approximately 1,159 shall be offered in evidence by plaintiff in a bundle as a single exhibit.

B(4) The following documents relating to public sealed bidding shall be fastened together as one volume, and offered in evidence as such: 5451; 480; 758; 508; 477; 84; 85; 10,246. Separate exhibit numbers will be given to each of the documents thus fastened together.

B(5) The following provisions of the stipulation between the parties approved by the Court on April 2, 1951, are hereby incorporated in this order for ready reference:

(a) That no party shall object to the introduction into evidence of any contract, agreement, letter, or memorandum or other document obtained or produced from or available in the files of any defendant, or submitted in advance by the plaintiff to the defendants or by any defendant to the plaintiff, on the ground that a printed or photostatic copy is offered instead of such document, provided, however, that any party may on reasonable notice demand the production and offer of the original in place of such copy.

(b) That no party shall object to the introduction into evidence of any officially printed report, publication or document issued by any branch, department or agency of the United States Government or of any state government on the ground that such printed copy has not been certified or authenticated.

(c) That no party shall object to the introduction into evidence of quotations of any state law taken from a plainly identified official publication on the ground

that such publication has not been certified or authenticated.

(d) That no party shall object to the introduction into evidence of any schedule or other compilation on the ground that the source material of such schedule or other compilation is not physically present in court, provided that the identity and location of such source material is clearly indicated on such schedule or other compilation, that such source material is available to the parties in the City of New York, and that a copy of such schedule or other compilation has been furnished the other party not later than sixty days in advance of their being offered in evidence.

B(6) The order of plaintiff's proof, subject to such further directions as may be made during the trial, shall be as follows: (1) the statements of basic uncontroverted data relative to the history and antecedents of each separate defendant firm, which are now being placed in final form; (2) the bundle of syndicate agreements hereinabove referred to; (3) thereafter the order (including documents, depositions and witnesses) shall substantially follow that set forth in the Table of Contents of the 458 page "Trial Brief for the United States", Part I, containing the "Summary and Analysis of Facts," a copy of which is appended to this order.

### C. Miscellaneous

C(1) For the convenience of the Court and counsel, and to avoid delay and confusion, notice of a change of subject matter in the presentation of evidence by plaintiff or by any defendant, during the entire trial, of the calling of witnesses, and of the order in which documents shall be offered by counsel for plaintiff, shall be as follows:

(a) Three (3) days' notice (exclusive of Saturday and Sunday) of the taking up of a new subject matter and of the calling of a witness, where it is reasonable to suppose that the adversary party or parties may by reason of the prior proceedings herein have had sufficient opportunity to prepare for the cross-examination of such witness.

(b) Five (5) days' notice (exclusive of Saturday and Sunday) of the calling of

what has been described in the Pre-Trial Conferences as an "outside" witness, such as one whose identity and connection with the case has not been previously disclosed or a witness whose name may have been mentioned but with respect to whom it is reasonable to anticipate that the adversary party or parties may require more than three (3) days' notice as hereinabove provided; in case of doubt application is to be made to the Court for further directions, well in advance of the calling of any witness, so that there may be no unnecessary argument or delay.

(c) When it is proposed to read parts of certain depositions, a list of the parts proposed to be read shall be served at least twenty-four (24) hours (exclusive of Saturday and Sunday) before such reading in order that opposing counsel may in advance select the other portions of said deposition which such counsel may desire to read by way of explanation or otherwise to supplement the parts proposed to be read by counsel for the party serving such notice. In order that counsel may be afforded an opportunity to work out the matter of deposition reading among themselves informally, the operation of this subdivision, C(1)(c), is suspended until further notice by the Court.

(d) Counsel for plaintiff are to follow the sequence of documents to be offered as stated in lists of numbers thereof to be furnished to counsel for defendants from time to time so that counsel for defendants will at all times know one hundred (100) numbers in advance of the state of the evidence at any given time.

C(2) To avoid confusion, delay and unnecessary discussion counsel for plaintiff are hereby directed to refer to the "defendants", "they" meaning the defendants, and "the defendant banking group" only when reference is intended to each and every defendant acting jointly; wherever reference is made to two or more defendants or defendant firms, but not all, the names and identity of such defendants or defendant firms shall be specified.

C(3) The applicable provisions of Pre-Trial Orders Nos. 1 and 2 which have not

been superseded by the course of events are continued in full force and effect.

C(4) Any party may move at any time for a clarification or modification of this order.

### MEDINA, District Judge.

This civil action in equity is brought by the United States against seventeen investment banking firms and the Investment Bankers Association of America under Sections 1, 2 and 4 of the Sherman Antitrust Act (15 U.S.C. Secs. 1, 2, 4). The charge is not made against the industry as a whole.

On February 13, 1948, I was designated by Honorable John C. Knox, now the Chief Judge but then Senior District Judge of this Court, to preside at the trial, to hear and determine all motions and to supervise all pre-trial procedures in this case.

Prior to the filing of my Memorandum of May 25, 1950, twenty-seven (27) pretrial hearings had been held; procedures of the most elaborate character were adopted for the purpose of facilitating the authentication and printing of many thousands of documents. The basic data relative to all but a small proportion of the security issues brought out in the United States in the period from 1935 to 1949 were stipulated; and many months were consumed in the preparation, under the supervision of the Court, of a large number of admissions and answers to interrogatories. Every effort was made completely to remove from the case every element of surprise which might serve to confuse and delay the trial. A fairly complete statement of these early pre-trial procedures is set forth in the said Memorandum of May 25, 1950; and the cooperation of each and every one of the lawyers representing the respective parties, which is commented upon in said Memorandum, has been a conspicuous feature of what has since been accomplished to clear the decks for the trial.

Despite the thousands of pages of discussion and argument and the very substantial amount of study and reading during the period when the twenty-seven (27) pretrial hearings above referred to were being conducted, it was evident to me, as I approached the opening of the trial that, despite the fact that it seemed to me that the complaint clearly stated a cause of action or claim for relief, setting forth the nature of the conspiracy, restraint and monopolization therein charged and asserting an integration of the very large number of separate but allegedly inter-related phases of the charge, I was wholly without a sufficient understanding of the issues and the law applicable thereto, to be qualified to take the further steps necessary for the conduct of an orderly trial and the building up of a record of manageable proportions.

Pre-Trial Order No. 2, 10 F.R.D. 240, contained the following direction:

(8) That sixty (60) days in advance of October 9, 1950, plaintiff shall furnish defendants with a list describing by number all documents which plaintiff intends to offer in support of its affirmative case on the merits and arranging such document numbers in an organized manner in accordance with plaintiff's theory of its case.

Such a list was furnished on September 15, 1950 and supplemented on November 3, 1950. The delay in furnishing the first list was authorized by the Court, with the consent of all parties. These two lists, entitled respectively "Notice and Memorandum Listing Documents to be Offered in Support of Plaintiff's Affirmative Case" and "Notice and Supplemental Memorandum Listing Documents to be Offered in Support of Plaintiff's Affirmative Case", listed over four thousand (4,000) documents arranged "in an organized manner" as I directed. Evidently through inadvertence the supplemental list was served after the time provided in the Pre-Trial Order No. 2 without any application to the Court for permission to do so. I have overlooked this as is shown by the provisions of the annexed Pre-Trial Order No. 3 relating to this matter, but it is worthy of note that pre-trial procedures so indispensable in complicated cases of this nature will be of little value if the provisions of such orders are to be treated as merely preliminary and advisory and to be disregarded with impunity.

In any event the number of documents to be offered as part of plaintiff's case was thus reduced from an estimated ten thousand, six hundred forty (10,640) or more to approximately four thousand (4,000).

By way of further preliminaries to the commencement of the trial, there was served by the government a trial brief, Part I of which, containing some 458 pages, was devoted to a Summary and Analysis of Facts, and Part II, containing 81 pages, devoted to the Applicable Law. These were supplemented by a further brief of 609 pages entitled "Appendix B, Part I, Traditional Banker Charts" and another of 143 pages of tabulated data entitled "Appendix B, Part II, Historical Position Charts." Defendants filed a joint "Preliminary Memorandum" for the Court of 117 pages.

Had I permitted the usual brief and formal opening statements, I do not see how I could have exercised any intelligent control over the trial. In any event, I encouraged counsel for both sides to indulge in a very wide latitude in presenting their respective versions of the facts and the law. The first opening statement began on November 28, 1950. The openings in all consumed sixty-six (66) days of the time of the Court; fourteen (14) counsel were heard, three (3) on behalf of the plaintiff and eleven (11) on behalf of various defendants; in all the openings and various colloquies between the Court and counsel and between the various counsel made a record of some five thousand, four hundred fifty-three (5,453) pages.

Despite the magnitude of the record thus made, it is my judgment that not a moment of this time was wasted. It soon became apparent to me that a further pre-trial order was absolutely indispensable; and I accordingly announced that the openings would be treated by me as combined openings and pre-trial hearings; and counsel for all parties proceeded without objection to the adoption of this procedure.

It soon became evident that many of the charges of price fixing had to do generally with the syndicate method of underwriting and placing securities in the hands of investors, institutional and otherwise. De-

spite the insistence of counsel for the plaintiff that it was not attacking the syndicate method as such, there could be little doubt that if the plaintiff's contentions on the law were sound, every underwritten security issue brought out by the syndicate method for some thirty-five (35) years or more in the United States constituted an illegal conspiracy, combination or agreement in violation of the Sherman Act. While the openings indicated that there was a great difference in the makeup of the many different types of syndicate agreements in use by investment bankers, hardly any of them could be free from one or another of the infirmities alleged, should the plaintiff's view of the law be sustained. Accordingly, I directed that there be filed and there were filed briefs discussing at great length the law points thus raised. I shall endeavor to complete my research on this phase of the case and to form a tentative judgment on the applicable law prior to the taking of testimony which, as provided in the annexed Pre-Trial Order No. 3, is set for April 30, 1951.

It is worthy of note that no adjudication is sought by plaintiff relative to the legality of the so-called price fixing features of the syndicate method generally. Should it be found as a fact that there was no over-all combination, agreement or conspiracy such as is alleged, it is evidently contemplated by plaintiff that these intricate legal points be permitted to remain in nubibus. In other words, the relevancy of the so-called price fixing features of the syndicate method to the case is solely for their bearing on the nature and extent of the combination, agreement or conspiracy charged, if any such combination, agreement or conspiracy be found, and perhaps for their bearing on the question of purpose and intent. In any event, it seemed to me to be imperative that I give this matter careful study prior to the taking of any evidence in the case.

Many areas of factual and legal controversy were clearly delineated as the openings of counsel progressed.

Numerous obscurities were clarified and as a result several motions for leave to amend the complaint were made and these were granted, without opposition. Except

in the case of the withdrawal of one of the minor charges and the abandonment or curtailment of certain other subject matters treated in the briefs submitted on behalf of plaintiff, the text of the amended paragraphs of the complaint are contained in the annexed Pre-Trial Order No. 3.

The unifying elements of the conspiracy, about which there was seemingly endless discussion in the course of the openings of counsel, still remain obscure to me. The conspiracy as alleged in the complaint is a single over-all conspiracy, charged generally against "the defendants" and covering the period from 1915 to the date of the filing of the complaint on October 30, 1947.

What has puzzled me from the outset has been the manner in which the plaintiff proposes to prove that the several firms constituting "the defendants" acted jointly in this matter. Despite the references to testimony and documents to be produced and the prolonged discussion pro and con, I am still in the dark as to what will constitute the unifying element or other nexus which is to place these defendants, perhaps with a few investment banking firms more or less, in a conspiracy or combination to restrain or exclude the competition of the rest of the investment bankers and to monopolize the business or any part thereof to the detriment of such other investment bankers.

I am assured, however, that when the proofs are in and I see the picture as a whole, the mosaic as it is called, with all the separate pieces put together, the conspiracy by these defendants will be clear.

However, except insofar as they produced evidence of some sort which is independently admissible before me now, the numerous investigations by Committees of the Congress or others, including that before a Grand Jury of this Court which filed no indictment, are and can be of no probative significance, and can form no part of the so-called mosaic.

It is obviously my duty to keep the defendants in mind as separate entities until the plaintiff sustains the burden of proving the alleged combination and conspiracy.

One of the most difficult things in a trial covering so long a period of time and such a multiplicity of separate transactions is to keep clearly in mind the independent proof which is said to establish the conspiracy and the multitude of other bits of evidence, documentary and otherwise, which are admissible only in the event that the conspiracy or combination is proved and the necessary connection thus made.

Had I been able to discern the unifying principle or connection, I should have been content to receive the proofs in the usual way and then, in connection with the motions to dismiss and argument thereon at the close of the plaintiff's case, to do my best to make the necessary determinations with reference to each of the defendants.

Because of the situation which I have just described I have hit upon an expedient, described in the annexed Pre-Trial Order No. 3 which will in no way hamper the plaintiff in the introduction of its evidence, but will serve to clarify the state of the proof before I hear and determine the motions to dismiss.

Declarations of alleged co-conspirators made in furtherance of the objects of the alleged conspiracy will be received subject to connection and subject to a motion to strike. At the conclusion of the government's case-in-chief, argument on the motion to strike will be heard and at that time the burden will be upon the government to show a *prima facie* case of combination as alleged against each defendant from evidence *"aliunde."*

I have adopted this procedure because of the unusually complicated and involved factual issues presented, because of the scope of the charges, because of the number of defendants and because of the absence of any readily apparent or explicable "unifying element" or elements whereby the alleged co-conspirators may be brought together into a unit. This apparent absence of what I have called a "unifying element" makes the factual issue of conspiracy or agreement one of the most crucial and complex in the case, and distinguishes this case, insofar as problems of proof are concerned, from every other

anti-trust case which has been brought to my attention.

For example, in Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, there was, as the basis of the conspiracy charge, a letter from the principal defendant to eight distributors of motion pictures, all of whom were named as addressees, and each of whom received identical copies. The letter made certain proposals, and the eight distributors took identical action in response thereto.

In Fashion Originators Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949, there was a trade organization which concededly represented its members and administered an agreement among them.

In United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461, there were a series of identical agreements between a patentee and various of its competitors granting those competitors licenses under a patent. Each competitor was aware of the existence of the other identical licenses.

In American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, the three leading cigarette manufacturers were the defendants; each of the "Big Three" refused to purchase tobacco at a tobacco market unless the others were represented at that market; new markets accordingly could not be established without unanimous consent of the "Big Three", after consultation among them; grades of tobacco were established, representing insignificant differences in quality, and maximum prices for such grades agreed upon; each of the "Big Three" were, in effect, allocated grades of tobacco which the others did not seriously intend to purchase; nevertheless the prices for such grades were bid up to the maximum so that each paid the same price for whichever grade of tobacco he purchased. On the selling end, each of the "Big Three" pursued uniform price policies over a period of years, with simultaneous and identical price increases and decreases. These policies were designed, in part at least, to eliminate the competition of certain manufacturers of lower-priced cigarettes.

United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, involved the same type of "unifying element" as did the Masonite and Interstate Circuit cases.

In United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, there was industry-wide uniformity of action among the eight distributors of motion pictures in the establishment and maintenance of minimum exhibition prices, and in other ways and for other purposes.

The government has been unable to point to any similar unifying element in this case. It does not claim the existence of any document or series of documents which will tie the 17 defendant firms together, as in the Interstate Circuit, Masonite and Gypsum cases. No trade association conducts the allegedly illegal practices, as in the Fashion Originators Guild case. The defendants, on the face of the openings alone, do not seem to be the equivalent of the "Big Three" in the American Tobacco case, since there appear to be many non-defendants who are larger, have more capital, and do more business than some of the defendants. The defendants' agreement is allegedly intended to exclude from the business those who are "non-defendants", but the latter category seemingly is composed only of those investment bankers who have not been named as defendants in this action, and does not indicate any factual unifying element, as did the attempted exclusion of ten-cent cigarette manufacturers in the American Tobacco case. Moreover, it is not clear which non-defendants are claimed to be co-conspirators, and which were the victims of the conspiracy.

This is not an industry-wide conspiracy, as in the Paramount case, and, finally, the uniformity of action which forms the basis of the Paramount and American Tobacco decisions is not, in this case, a uniformity among all seventeen of the defendants as to each alleged practice: the term "the defendants", when used during the openings, has apparently been intended and understood to mean "some of the defend-

ants." I have attempted to eliminate from the trial, by one of the provisions of the annexed Pre-Trial Order No. 3, this fruitful source of confusion and endless argument and discussion.

I do not wish to be understood as suggesting that absent a "unifying element" such as I have described, and such as has been found in prior anti-trust cases, there can be no agreement or conspiracy. But I do feel that absent such a unifying element a Court should proceed cautiously in allowing the statements of alleged co-conspirators to be used against a defendant. Cf. Krulewitch v. United States, 1949, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (concurring opinion). At the same time, I do not wish to prejudice the government or prevent it from fairly presenting its evidence, or unduly to complicate the mechanics of the trial. The procedure which I have described above seems to me appropriate in this case to keep the burden of proof where it belongs, and at the same time, facilitate orderly procedure and consideration of all the admissible evidence which the government desires to submit.