Martin B. Stecher, J.
On April 26, 1969 horse racing at Aqueduct Race Track in New York City came to a sudden halt and was not resumed until May 7, 1969, following the issuance of a preliminary injunction by a Justice of this court. The order was subsequently affirmed (33 AD2d 1006). The cessation, it is alleged in the complaint, was the result of an illegal boycott (General Business Law, § 340) organized by the Horsemen’s Benevolent and Protective Association, New York Division (HBPA), which, with its officers, were named as defendants in this action. The Attorney-General seeks a permanent injunction under the Donnelly Act (General Business Law, § 342) and a civil penalty as therein provided (General Business Law, §§ 341, 342-a).
The Attorney-General contends that the defendants, in violation of the statute, induced "horsemen”, by agreement with them and among themselves, to withhold entries on the days in question, thereby restraining "the free exercise of * * * activity in the conduct of * * * business * * * in this state” (General Business Law, § 340, subd 1). The defendants resist, acknowledging the cessation of racing, but asserting that the stoppage was a voluntary act on the part of its members neither solicited by defendants nor resulting from any agreement by the defendants among themselves or with others; that the cessation, in fact, was a protected act under the State Constitution (art I, § 9, subd 1) in that it was in effect a petition to the State Legislature for redress of a grievance; and finally, that the acts were exempt from prosecution under the Donnelly Act because they resulted from a "labor dispute” (General Business Law, § 340, subd 4).
After trial, I find the following facts:
The HBPA is an organization which includes racehorse owners and racehorse trainers. The owners, as the name implies, own the horses which race at tracks around the country hoping to win purses by winning performances. Train *579 ers are those who take into their custody the horses of owners and in return for a fee together, in some instances, with agreement for a portion of winning purses, feed the horses, train them, select races in which they should run and enter the horses in such races. Some trainers are solely employed by one stable. Others, "independent trainers”, accept horses from as many as three or four owners, or perhaps more, at a time. In some cases, the trainer will also race horses of his own. The trainers, in turn, employ personnel such as foremen, grooms, exercise boys, hot-walkers and assistant trainers who exercise the horses, carry water, clean stables and do other work in that category. They are generally referred to as "back-stretch” personnel or simply "the back-stretch”.
The "back-stretch” was a source of difficulty to trainers and owners over the years. The men were relatively poorly paid and agitated from time to time for improvement in their working conditions. As long ago as 1961 they struck, their demands then including a pension plan. International labor unions have sought to organize them, unsuccessfully, but their desire to improve their economic condition in no way abated.
One of the demands of the "back-stretch” personnel in 1968 and 1969 and of their employers was a pension plan. Racing being tightly controlled in this State, particularly as to the distribution of monies wagered, the potential source of pension funds was limited and horsemen (the generic term for owners and trainers) sought to induce the State Legislature to permit certain wagering proceeds to be set aside to fund a pension plan. According to the plaintiffs witness Basil, an officer of the New York Racing Association, the pension plan was intended to cover both the "back-stretch” and the trainers and I find that to be a fact. According to the plaintiffs witness Gimma, Chairman of the New York State Racing Commission, a number of conferences had been held by him with the defendants and others prior to the work stoppage in which a specific pension plan was proposed and considered. A pension bill was introduced in the Legislature in the 1969 session but when the Legislature adjourned on or about April 23 of that year, the bill had not been reported out of committee and no action had been taken on it. Feeling ran high and a series of meetings, sponsored by HBPA officers, were held at Aqueduct Race Track where races were then being conducted by the New York State Racing Association. From the testimony of the witnesses and from the minutes of the meetings taken by *580 an employee of the HBPA, I find that the HBPA and its defendant officers undertook as charged, in concert with each other and like-minded horsemen, to stop racing at Aqueduct until some pension provision was made.
Despite the effort to create an appearance of individual action, they organized successfully the termination of racing at the Aqueduct Race Track effective April 26, 1969.[1]
The question is: Of what legal effect is this finding?
The Attorney-General argues in his memorandum of law that "a group boycott * * * intrinsically and inherently restrains the free exercise of trade, business and commerce, and competition in the supply of goods and services, and such concerted action is therefore illegal on its face”; in short, that every boycott is per se illegal. The law is not nearly so sweeping in its scope. Certainly, it recognizes legality as well as illegality in the use of the boycott (cf 15A C.J.S., Conspiracy, § 12, subds a, b). At this very moment, naturalists concerned with the survival of marine mammals are organizing a boycott of Japanese and Soviet products. Other naturalists have long advocated a boycott of articles made from the skins of endangered species of animals. No prodigy of memory is required to recall pre-World War II boycotts of exports from certain totalitarian nations. It has never been suggested that boycott so motivated ran afoul of the anti-trust laws.
An examination of the boycott cases relied on by the plaintiff or cited within them as authority discloses a common element making for illegality which is absent here: acts tending to create a monopoly. In Klor’s v Broadway-Hale Stores (359 US 207), the defendant chain-store and the defendant manufacturers conspired to limit the plaintiff retailer’s ability to compete with the chain-store, in part, by refusing to deal with the plaintiff. In Northern Pacific Ry. Co. v United States (356 US 1), the railroad sold or leased its land only to those who agreed not to ship their produce or manufacturers over the lines of any other railroad. In Eastern States Retail Lumber Assn, v United States (234 US 600), the defendant conspired to prevent wholesalers from selling to the competitors of the defendant members. In Fashion Guild v Trade Comm. (312 US 457), a case frequently cited by the courts, an organization of creative fabric and clothing designers con *581 spired to destroy the competition of those who copied unprotected designs by boycotting those retailers who undertook to sell the copies. In the American Tobacco Co. v United States (328 US 781, 786), the court proceeded on the assumption that "a combination or conspiracy to monopolize has been established”. In United States v Patten (226 US 525, 542), "it was a conspiracy to run a corner in the [cotton] market”. In Kiefer-Stewart v Seagram & Sons (340 US 211), a liquor manufacturer declined to sell well-known branded products to those who did not follow its pricing policy. And in Binderup v Pathe Exch. (263 US 291), the defendant motion picture distributors refused to lease films to an exhibitor in an effort to put him out of business for refusing to allow the defendants to participate in his redistribution business.
It would be ludicrous to suggest the boycott led to monopolization. By law, with one minor exception, the State, through its designee, the New York Racing Association, runs the only game in town. In the words of the Assistant Attorney-General, "Pari-mutuel betting at racetracks is a completely illegal activity unless permitted by the legislature under very strict controls in this state. The so-called pari-mutuel tax is referred to, even in the pari-mutuel revenue law, as the state’s share of the handle * * * The state is really a partner of the track”. Restraint of trade tending toward monopoly does not exist here.
At the end of the trial, the defendants moved to conform the pleadings to the proof by describing their actions as a product of a labor dispute and therefore exempt from the strictures of the Donnelly Act (General Business Law, § 340, subd 4). The motion is granted. The defendants point to the long history of labor disputes involving the "back-stretch” employees, their demand for improved economic conditions generally, and particularly to their demand, during the year preceding the stoppage of racing, for a funded pension plan. The defendants contend that it is irrelevant that the "backstretch” employees did not stand in any relationship of employer-employee to the New York Racing Association and that the horsemen are themselves employers rather than employees (cf. National Mar. Union v Commerce Tankers Corp., 325 F Supp 360; Federation of Musicians v Carroll, 391 US 99).
The case, however, need not turn solely on the "backstretch” employees and their demands. It is appropriate to *582 examine what was sought and the functions of the people seeking it. The HBPA sought a pension plan for the "backstretch” employees and for its trainer-members as well. (The owner-members, who were not to be covered by the plan, opposed the stoppage. The trainer-members, who were to be covered by the plan, forced the cessation of racing.) From the evidence, it appears that a majority of the trainer-members were not employees in the conventional sense but independent contractors. Yet, the Legislature which "declared in unmistakable terms that our antimonopoly laws are not to be used against workers seeking to better their lot” (People v Gassman, 295 NY 254, 259) did not limit the exemption to persons standing in the jural relationship of employee. The statute used the broader word "workingmen”. " 'Workingmen’ means people who perform certain tasks, rather than people in certain contractual relationships” (People v Gassman, supra, p 261). In the Gassman case, the defendants had driven trucks as employees of laundry companies. Thereafter, for reasons best known to their employers, all such employer-employee relationships were terminated. The drivers were required to purchase their own trucks and deal directly with the users of the service as entrepreneurs, keeping for themselves the difference between the charge made to the drivers by the laundries and the drivers’ charges to the consumers. The former drivers, now called "agents”, "became in time more and more independent and began to shop around among the various laundry companies for the best terms. Some of them combined together to operate their own laundries. Others, singly or in groups, conducted stores where customers brought laundry and called for it when finished” (People v Gassman, supra, p 259). These agents were organized by a national union and were prosecuted for a "strike” called against the laundry companies. In applying the "workingmen” exemption of the Donnelly Act to these defendants, the court said (p 261), "The members of this local union are workingmen who do part of the job of washing household linens. As such, their organized activities for self-betterment are specifically exempted from the Donnelly Act, and no grand jury had any right to indict them for violating that act * * * The conclusion here reached is consistent, also, with cases extending other labor laws to independent 'non-employee’ workers” (cf. Drivers’ Union v Lake Valley Co. 311 US 91).
The plaintiff in seeking to meet this issue relies in great measure on People v Masiello (177 Misc 608, affd 271 App Div *583 875). There the news dealers’ union which picketed other news dealers in an attempt to stop them from buying certain New York City daily newspapers were preliminarily enjoined. The Appellate Division, however, recognized that a triable issue existed as to whether or not the defendants were "workingmen” within the holding of People v Gassman (supra).
It seems clear from the evidence that the defendants in this case occupied functions and positions parallel to the laundry "agents” in People v Gassman (supra). It was their function to train the horses and otherwise prepare them to engage in racing. The fact that they had their own employees (as presumably did the laundry "agents” who operated laundries and retail stores) and even raced horses of their own is not sufficient to cause these people to be described as other than workingmen within the meaning of the statute and, therefore, exempt from the injunctive and civil penalty provisions of the statute (General Business Law, §§ 342, 342-a).
Finally we turn to the argument made by the plaintiff that the decision on the application for the preliminary injunction, sustained as it was by the Appellate Division, is binding upon this court in the determination of the dispute. That view is clearly erroneous. "A complete answer to this contention is that the granting of a temporary injunction serves only to hold the matter in status quo until opportunity is afforded to decide upon the merits. The granting or refusal of a temporary injunction does not constitute the law of the case or an adjudication on the merits, and the issues must be tried to the same extent as though no temporary injunction had been applied for” (Walker Memorial Baptist Church v Saunders, 285 NY 462, 474; cf. Weisner v 791 Park Ave. Corp., 7 AD2d 75; People v Masiello, 271 App Div 875, supra).
The complaint is dismissed and judgment may be entered accordingly. The preliminary injunction is vacated effective 10 days after service of a copy of the judgment with notice of entry.

. Although an effort by some owners or trainers to resume racing was frustrated by the brief violence of "back-stretch” employees, there is no evidence that the defendants caused it or even counselled it.